No. 44,494

L. D. McElhaney, *Appellee*, v. Dale M. Rouse, *Appellant*, (and Dale G. Wilshire, *Defendant.*)

(415 P. 2d 241)

Opinion filed June 11, 1966.

*Robert A. Coldsnow,* of Wichita, argued the cause, and *E. Lael Alkire, Richard B. Clausing, Aubrey J. Bradley, Jr.,* and *Gillard Cohen,* all of Wichita, were with him on the briefs for the appellant.

*Gerald Sawatzky,* of Wichita, argued the cause, and *Robert M. Siefkin, Donald R. Newkirk,* and *Robert T. Cornwell,* all of Wichita, were with him on the briefs for the appellee, and *Robert C. Foulston, George B. Powers, Carl T. Smith, John F. Eberhardt, Howard T. Fleeson, Homer V. Gooing, Wayne Coulson,* and *Paul R. Kitch,* all of Wichita, of counsel.

The opinion of the court was delivered by

Kaul, J.: This is an action for personal injuries brought by plaintiff, L. D. McElhaney, against defendants, Dale G. Wilshire and Dale M. Rouse. The defendant Rouse filed a cross-petition against the plaintiff McElhaney. During the trial a motion for a directed verdict by defendant Wilshire was sustained and he was removed from the case. A verdict was returned against plaintiff McElhaney and also against defendant Rouse on his cross-petition. The trial court overruled the respective motions of both parties for a new trial. Defendant Rouse has appealed to this court while plaintiff McElhaney did not appeal.

The action stems from an accident involving the cars of the three parties. It occurred north of Wichita on North Hillside Avenue, a

blacktop street running north and south, the blacktop or paved portion thereof being twenty-seven feet in width at the point in question.

Defendant Wilshire, and two companions, Jackie R. Brown and David Wilson, were air force men, attached to Schilling Air Force Base at Salina. Prior to the accident they were proceeding north on Hillside in Wilshire's 1956 Mercury convertible when the engine hood came loose and popped up. Defendant Wilshire, who was driving, pulled to the right-hand edge of the road and parked. Wilshire testified that he pulled over as far as he could then stopped the car and got out to see what he could do about the hood on the car. He testified that the inner wheels of his car might have been just on the blacktop itself.

Defendant Rouse, seventeen years of age at the time of the accident, was driving his black 1955 modified Chevrolet in a northerly direction on Hillside and observed the parked Wilshire car. He proceeded north on Hillside to a drive entering a field, turned around and came back south on Hillside to offer help to the parked car. He testified that he parked his car on the west side of the road opposite the Wilshire car, approximately a car length north of the Wilshire car. Jackie Brown, an occupant of the Wilshire car, testified that the front bumper of the Rouse car was even with the back fender of the Wilshire car and the two cars were within a foot and one-half of being even or parallel. Rouse testified that the left wheels of his car were right on the edge of the pavement and that the body of his car extended a foot and one-half to two feet over the blacktop pavement. On cross-examination he recalled that in previous testimony given in a deposition he had estimated that the body of his car might have been two and one-half to three feet out on the roadway.

Plaintiff McElhaney testified that at approximately 10:30 p. m. on the night of the accident his wife had called and requested him to come to Wesley Hospital, where she was employed, and drive her home. He left his house at approximately 10:45 p. m. and drove his 1956 Chevrolet station wagon south on Hillside. He testified that he had been driving fifty to fifty-five miles an hour as he proceeded south on Hillside, slowed down to about forty-five to fifty miles an hour in crossing some railroad tracks and then passed a turkey farm. The testimony of other witnesses located the railroad tracks about a quarter of a mile north of the collision site. All he

remembers after passing the turkey farm was a blinding flash of light "just a bright, white, blinding flash." He remembered nothing more until he woke up in the hospital the next afternoon after having surgery. He further testified that he did not remember seeing any objects on the road prior to the collision.

The physical facts developed by the testimony of various witnesses of both parties disclosed that the right front of McElhaney's car collided with the left rear of the Rouse vehicle. After the impact the McElhaney car swung across the road, the left rear fender and bumper colliding with the left front of the Wilshire car, and inflicting personal injuries upon defendant Rouse who was standing beside the left front fender of the Wilshire car.

Appellant Rouse (defendant and cross-petitioner below) briefs and argues three points in seeking a new trial. Rouse first argues the trial court erred in refusing to give a requested instruction on the last clear chance doctrine. He contends the evidence indicated that the doctrine of last clear chance was applicable to the facts as developed in the trial.

The trial court, in denying the requested instruction, ruled as follows:

"I'll overrule the proposed instruction for the reason that the court is of the opinion that the last clear chance doctrine is not applicable in this case. The court is of the opinion that this is a case of straight negligence on the part of the plaintiff, if any, and straight negligence on the part of the defendant, if any, and that there is no evidence that would support the last clear chance doctrine."

Appellee McElhaney contends the trial court's refusal to submit the requested instruction was proper for two reasons. He first contends that appellant's claim of error in this regard is not available for appellate review because appellant failed to include in his record on appeal other pertinent instructions of the court which were submitted to the jury.

The appellant's contention in this regard is based on the familiar and well-established rule of this court that where a party raises questions regarding instructions on appeal he must include at least all instructions pertinent to the point in issue in his record on appeal. (*Connell v. Norton Coca-Cola Bottling Co.,* 187 Kan. 393, 357 P. 2d 804; *Neely v. St. Francis Hospital & School of Nursing,* 188 Kan. 546, 363 P. 2d 438.)

Appellee McElhaney's statement of the rule and its applicability in general is correct. However, in the instant case the trial court's

ruling in denying the requested last clear chance instruction clearly pin-points the issue. We have concluded, therefore, that the question has been sufficiently delineated in the record to warrant our consideration of it on the merits, even though other instructions were not included.

The ruling of the trial court was premised on its opinion that the last clear chance doctrine was not applicable to the evidence in the case. A review of such ruling necessitates our consideration of the elements of the doctrine as applied to the evidence developed at the trial.

The elements of the doctrine as recognized in this jurisdiction have been announced in numerous decisions of this court. The most recent treatment of the subject was made in *Letcher v. Derricott,* 191 Kan. 596, 383 P. 2d 533, in which the elements as stated in *Gibbs v. Mikesell,* 183 Kan. 123, 325 P. 2d 359, were quoted as follows:

" 'The essential elements under the doctrine of last clear chance are: (1) The plaintiff by his own negligence placed himself in a position of danger; (2) that the plaintiff's negligence had ceased; (3) that the defendant seeing the plaintiff in a position of danger, or by the exercise of due care should have seen the plaintiff in such position, by exercising due care on his part had a clear chance to avoid injuring the plaintiff; (4) that the defendant failed to exercise such due care; and (5) as a result of such failure on the defendant's part plaintiff was injured. (*Goodman v. Kansas City, M. & S. Rld. Co.,* 137 Kan. 508, 21 P. 2d 322; and see, Restatement of Law, Torts, Negligence, § 479.)' (p. 130.)" (p. 600.)

In considering the point at issue here, our attention is focused on element number two. In the *Letcher* case the language of the second element was discussed and it was stated:

"The use of the phrase 'that plaintiff's negligence had ceased' has caused some confusion. The phrase means, and perhaps the better term is, 'that the plaintiff had, by her own negligence, placed herself in a position of peril from which she could not extricate herself.' If the plaintiff could extricate herself from the danger, and did not do so, her negligence had not ceased. If the plaintiff could not extricate herself from the danger, her negligence had ceased." (p. 600.)

The applicability of the doctrine in the instant case depends upon a determination of whether or not appellant Rouse presented evidentiary support for element two as stated either *that the plaintiff's (cross-petitioner's) negligence had ceased or that the plaintiff had by his own negligence placed himself in a position of peril from which he could not extricate himself.*

Appellant Rouse testified that after he parked his car he took a flashlight and went over to see if he could be of aid to Wilshire's Mercury. After examining the Wilshire car he decided to return to his own car to get some wrenches. His testimony was as follows:

"Q. Then what did you do?

"A. Well, I was going to go across the street and get my wrenches and then I thought I would wait until the car came on down because it appeared to me it was coming pretty fast. I could hear it and I could see its lights, and they seemed to be coming pretty fast, so I just kept looking there and seen what size wrench I needed to take the hood latches off the hood hinges and I was standing facing north and I kept glancing up watching the lights come on down, and then the lights got there, why, I could see, facing me it was the left hand taillight, was aimed up the right hand taillight of my car, and I knew they were going to hit each other.

"Q. You mean the left hand taillight to the right hand taillight?

"A. No, the left headlight, as the car faced me, the left headlight, the west headlight of the car, was matching up with the east taillight of my car, and then collided.

"Q. How much before they collided did you have any indication that things weren't all right?

"A. Well, from maybe-from me to the wall over there, and I seen that it was coming close and I thought maybe it was some kids or something that was going to whip out around my car and they didn't and I had this little flashlight lit, and they didn't, and the lights kept on coming and ran into the back of my car.

"Q. What kind of a flashlight, describe the flashlight?

"A. It was a two-cell flashlight with a red reflector tip about an inch and a half, whatever they are, on the flashlight.

"Q. And where were you standing at the time you saw this car was about to hit your car?

"A. I was—in relation on the Mercury I was standing right where the hood stops and the windshield begins.

"Q. Where was Jackie Brown?

"A. In front of me, I believe.

"Q. And are you right or left-handed?

"A. Left.

"Q. Do you know which hand you had the flashlight in?

"A. The left. I'm left-handed.

"Q. Now, what is the next thing that you remember or know?

"A. Well, I watched the car aim right down on my light, and when it hit, why, there was a big ball of fire, and a big flash of light, and then I was on the ground, and Jackie Brown was in front of me, and there was glass all over."

He further testified on cross-examination:

"Q. All right. Now, Mr. Rouse, as I understand it, you saw the approach of the McElhaney car at the time it was up at the tracks, railroad tracks?

"A. That's right.

"Q. All right. And did you see any other car approach?

"A. The first lights I know was the McElhaney car.

"Q. Did you see any other headlights coming from that direction?

"A. No, not by my knowledge.

"Q. And after you saw it, then you saw this car approaching, you continued to work on your car—I mean, the car, didn't you?

"A. On this Mercury, yes, sir.

"Q. All right. And would it be fair to say that the first time that you have really a recollection of noticing the McElhaney car again was when it was about 20 to 30 feet behind your car?

"A. As far as I paid attention to it, yes.

"Q. All right. And how long or for what space or area would you say on Hillside that car would be in your vision as it approached?

"A. How far could I see this car?

"Q. Yes, could you see it if you had watched it, seen it all the way down from the railroad tracks?

"A. Well, at night I could have seen a light beam from the time it crossed the railroad tracks on.

"Q. All the way down to where you were?

"A. At night with the lights on, yes.

"Q. All right. And if you had watched, then you could have seen it come all the way down where the accident occurred, couldn't you?

"A. The lights, yes, sir."

From his own testimony it is clear that appellant Rouse was not in a position where he could not have extricated himself from danger. He admitted he saw the car, heard the car, and thought it seemed to be coming pretty fast. Yet he stood motionless in the roadway by the Wilshire car and watched McElhaney crash.

He could have extricated himself, either by stepping around in front of the Wilshire car or by warning McElhaney with his flashlight. Either action was available to him after he first saw the McElhaney headlights as far north as the railroad tracks.

Appellant Rouse was negligent not only in parking his car on the traveled part of the roadway in a hazardous position but he also violated K. S. A. 8-570 in doing so.

Pertinent portions of 8-570, *supra,* provide:

"(a) Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least twenty feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway."

The evidence in this case clearly establishes that it was practical for Rouse to park his car entirely off the traveled part of the highway. His failure to do so was a violation of the statute regardless of whether an unobstructed width of twenty feet was left opposite his car. In this connection officer Stackley testified that Rouse could have easily driven his car entirely off the pavement before parking. There was a level shoulder about eighteen inches in width adjacent to the pavement and then a gentle slope to the center of the side ditch on the west side of the road. Stackley's testimony is corroborated by plaintiff's (appellee's) Exhibit 12, a photograph clearly portraying the roadway, shoulders and both side ditches.

Rouse was also necessarily negligent in failing to warn of the danger which his prior negligent act had created. By his own testimony the means of warning were in his hands, and his failure to warn appellee continued to the time of the collision. It must be concluded that Rouse's continuing negligence was thus at least concurrent with any negligence of McElhaney.

Under similar facts, this court has repeatedly held the last clear chance doctrine inapplicable on the premise that the doctrine does not arise so long as the contributory negligence of the plaintiff (cross-petitioner here) continues. Some of the cases holding plaintiff not entitled to rely upon the last clear chance doctrine, where contributory negligence had not entirely ceased, are *Buchhein v. Atchison, T. & S. F. Rly. Co.*, 147 Kan. 192, 75 P. 2d 280; *Bazzell v. Atchison, T. & S. F. Rly. Co.*, 133 Kan. 483, 300 Pac. 1108; *Dearing v. Wichita Rld. & Light Co.*, 130 Kan. 142, 285 Pac. 621; *Gilbert v. Railways Co.*, 109 Kan. 107, 197 Pac. 872.

It can be said that under the evidence in this case Rouse could have extricated himself from peril prior to his injury and further his negligence did not cease but continued throughout the time of the collision.

Appellant next complains that an Exhibit purporting to be a traffic accident report was erroneously received in evidence. The Exhibit in question was a report of the accident by appellant Rouse, taken by Lt. Fred D. Myers of the Sedgwick County sheriff's office. The report was approved by Deputy Sheriff Frank J. Matheny and identified by him at the trial. At the trial, counsel for appellant objected to the admission of the report on the grounds that it was not properly identified; that it was not in evidentiary form; and that Lt. Myers had "no knowledge." Further objections were made to Lt. Myers testifying from the Exhibit unless he independently remembered the occasion. The only part of the report attacked by the appellant

were the words written by the officer, purporting to be a statement of Rouse, "He said: Did not have lights on but got way off road."

When questioned as to the taking of the report Lt. Myers testified as follows:

"A. I have no independent recollection of it; however it was my handwriting, and it was I that filled out the top part of this driving report and also the writing on the report.

"Q. All right. Now, when we are talking about a driver's report, what is a driver's report?

"A. That is a traffic accident report. It is a report that we take from the driver of each vehicle that is involved in an accident.

"Q. All right.

"A. It is their statement.

"Q. And this is something you regularly do in the investigation of an accident?

"A. Yes, it is.

"Q. All right. And does this statement indicate to you that you had a conversation with Dale M. Rouse?

"A. Yes, it does."

Officer Matheny who approved the report testified that it was his signature at the bottom; that the report was written by Lt. Myers; and that it was a part of the official reports in regard to this accident.

The appellant contends that the report was not admissible as substantive evidence. (*Morlan v. Smith*, 191 Kan. 218, 380 P. 2d 312; *Allen v. Ellis*, 191 Kan. 311, 380 P. 2d 408; *Letcher v. Derricott*, supra; *McGrath v. Mance*, 194 Kan. 640, 400 P. 2d 1013.) We do not agree with appellant's application of the rule cited in those cases. The *Morlan*, *Allen* and *McGrath* cases involve reports containing conclusions of the reporting officer, and the *Letcher* case contains a statement from a third party witness taken by the police officer. All are clearly inadmissible as substantive evidence. In the instant case the recorded statement was an admission of appellant Rouse. There were no conclusions of the officers or statements of third party witnesses such as recorded in the objectionable reports in the cases mentioned above.

Official traffic reports are generally admissible unless they contain information barred by the hearsay rule or conclusions of the officer taking the report. (*Mulich v. Graham Ship By Truck Co.*, 162 Kan. 61, 174 P. 2d 98; *Cooper v. Sorenson*, 182 Kan. 560, 322 P. 2d 748; *Hultberg v. Phillippi*, 169 Kan. 610, 220 P. 2d 208.)

The fact that when testifying at the trial Lt. Myers did not have an independent recollection of taking the statement of Rouse does not preclude his testimony from the statement, nor its admission in

evidence. The general rule is that a witness may testify from a written memorandum without having independent recollection if he made the entries and knew at the time of making them they were correct. (20 Am. Jur., Evidence, § 946, p. 798; *Garden City v. Heller*, 61 Kan. 767, 60 Pac. 1060; *Wright v. Wright*, 58 Kan. 525, 50 Pac. 444; *Mallinger v. Sarbach*, 94 Kan. 504, 146 Pac. 1148; *Supply Co. v. Case*, 116 Kan. 520, 227 Pac. 257.)

Appellant next contends the district court erred in permitting John F. Stackley to testify as an expert witness and to give opinion evidence based upon the facts not within his knowledge.

The uncontroverted evidence reveals that officer Stackley began traffic investigation work in 1937 and since that time he has served in numerous capacities as a traffic engineer and accident investigator. He has had two years of formal education in accident analysis in police science at Wichita University, and has attended and completed numerous short courses dealing with the subject in various universities. A scrutiny of his testimony reveals that his answers and opinions were founded on physical facts gathered by himself and other officers investigating the accident. His testimony further reveals that allowances were made for technical errors in measurements.

Since the testimony of Stackley was admitted by the trial court the trial judge is deemed to have made the findings requisite to the admission of such testimony as provided for in K. S. A. 60-456 (*b*) and (*c*). This matter was recently discussed in *Grohusky v. Atlas Assurance Co.*, 195 Kan. 626, 408 P. 2d 697. We adhere to the application of the provisions of 60-456, *supra*, as explained therein. Other cases, in which expert testimony relating to automobile accidents has been held properly admissible and generally within the discretion of the trial court, are *In re Estate of Storer*, 191 Kan. 645, 383 P. 2d 956; *In re Estate of Roth*, 191 Kan. 493, 382 P. 2d 320; Johnson, *Administrator v. Huskey*, 186 Kan. 282, 350 P. 2d 14; *Foreman v. Heinz*, 185 Kan. 715, 347 P. 2d 451. We find no error in the admission of officer Stackley's testimony.

Finally we are confronted with a motion by appellant to impose costs in the amount of $684.10 for printing 150 pages of the record which appellant claims was made necessary by excessive designation of appellee. The total costs of reproducing the record amounts to $1,118.00. We have permitted the filing of the 671 page trial court transcript in order that we might have a more informed view of the question raised by appellant's motion. Obviously time has

not permitted a minute analysis of the record as related to the trial transcript. However, we have considered the trial transcript with respect to the contentions of both parties in connection with the motion of appellant.

We find some merit in the contentions expressed in appellant's motion, particularly in connection with six or seven Exhibits, the inclusion of which we think unnecessary; several lengthy colloquies between counsel and between counsel and the trial court; and the court feels that appellee could have further substantially reduced designated testimony to narrative form without injuring the effectiveness of his presentation.

It is also to be noted that appellant failed to substitute appellee's designated testimony for the narrative portions of appellant's own designation but included both in the record.

As we indicated in *Johnston, Administratrix v. Ecord,* 196 Kan. 521, 412 P. 2d 990:

". . . The court realizes that great latitude must necessarily be left with the advocate in determining when verbal accuracy is required, and that there are instances wherein it is essential that questions and answers be reproduced in order to understand and assess properly such testimony. . . ." (p. 533.)

We recommend to the interested reader an article by Emmet A. Blaes, of the Wichita Bar, entitled "Another Look at Civil Appellate Procedure," published in the Judicial Council Bulletin for December, 1965. Mr. Blaes thoroughly examines the subject confronting us in his comments concerning what he has designated as Step 5 in perfecting a civil appeal. Mr. Blaes suggests this Step should be:

". . . a complete informal and amicable exchange of ideas and suggestions for arriving at a final Record on Appeal which is orderly, understandable, concise, and yet sufficient to get the substantial and good faith contentions of both sides before the appellate court. The idea of good professional relations can hardly tolerate less. . . ."

It is obvious that such an approach was not pursued by counsel in the instant case.

In this case we find failure to some extent on the part of counsel for both parties to fully comply with Rule No. 6 (c) and (e) of this court. However, because of the excessive designation of appellee, pursuant to Rules Nos. 3 and 6 (c), the costs of printing the record on appeal will be assessed three-fourths to the appellant and one-fourth to appellee, balance of costs of appeal to be assessed against appellant.

The judgment of the lower court is affirmed.