No. 45,729

NORMA JEAN SANDER, ELGERINE GROSS, DARRELL N. ENGEL, IMELDA MAE KARLIN, CLAYTON J. ENGEL, VERLIN JAMES ENGEL, and PHYLLIS ANN ENGEL, a Minor, by IMELDA MAE KARLIN, Her Guardian and Next Friend, *Appellees* and *Cross-Appellants,* v. UNION PACIFIC RAILROAD COMPANY, a Corporation, and J. L. WOOD, *Appellants.*

(470 P. 2d 748)

Opinion filed June 13, 1970.

*Charles Henson* of Lillard, Eidson, Lewis and Porter, Topeka, argued the cause, and *Clayton S. Flood,* Hays, was with him on the brief for the appellants.

*J. Eugene Balloun* of Turner & Balloun, Great Bend, argued the cause, and was on the brief for the appellees.

The opinion of the court was delivered by

O'CONNOR, J.: The tragedy giving rise to this appeal occurred at a railroad crossing in Ellis county when a Union Pacific Railroad train collided with an automobile occupied by Clara Engel and her husband Florian, killing them instantly. The district court rendered

judgment against the railroad and the train engineer upon special verdicts returned by the jury in favor of the Engels' heirs.

The controlling question is whether or not, under the evidence, the plaintiffs may be allowed recovery under the doctrine of last clear chance.

Although the case went to trial on allegations of ordinary negligence and contributory negligence of the respective parties, at the conclusion of all the evidence, plaintiffs, over objection, were permitted to amend their petition to include last clear chance as a basis for recovery. Thereupon, the trial judge proceeded to include the elements of the doctrine in his instructions, and the case was submitted to the jury. We quote two of the jury's special findings which clearly disclose that defendants were found liable under the last clear chance doctrine:

"5. Do you find that a member of defendants' engine crew observed Florian and Clara Engel in a position of peril from which they could not extricate themselves at a time when the engine crew could, by the exercise of reasonable and ordinary care have taken action which would have avoided the collision?

"ANSWER: Yes.

"6. If you answer the foregoing question 'yes', then state acts or action the engine crew could have taken which would have avoided the collision.

"ANSWER: By reducing speed."

A review of the evidence convinces us that the trial court erroneously submitted the case to the jury on last clear chance, and the resulting verdicts and judgment thereon cannot be sustained.

On January 30, 1964, about 5 p. m., Clara Engel was driving a 1963 automobile west on old Highway 40. Her husband Florian was riding with her as a passenger in the front seat. About five miles west of Hays a township road running north and south connects old Highway 40 with new Highway 40, an east-west road running parallel to the old highway. The Union Pacific Railroad track, which also runs east and west, lies between the two highways and intersects the township road about 132 feet south of old Highway 40. The Engel car approached the intersection of old Highway 40 and the township road and turned south to cross the railroad track in order to reach the new highway. In making the turn, Mrs. Engel used a sweeping-type of "cutoff," or curve in the road, which had been caused by automobiles using it as a shortcut onto the township road instead of proceeding directly to the intersection and making a sharp left turn. A car using the curve would travel a distance of approximately 150 feet from old Highway 40 to the railroad track. At the south edge of old Highway 40 was a shallow

ditch which cars crossed when using the curve, or shortcut, to reach the township road.

Located near the southwest corner of the intersection of old Highway 40 and the township road was a house and several old automobiles which partially obstructed a clear view of the railroad track to the west of the crossing. There was undisputed evidence, however, that an occupant of an automobile on the township road, approaching the track from the north, could see to the west, down the track, for a distance of approximately 1,000 feet upon reaching a point 73 feet north of the crossing. On the northwest corner of the crossing was an "X"-type sign which warned, in large letters, "RAILROAD CROSSING   LOOK OUT FOR THE CARS."

The Union Pacific passenger train, consisting of nine cars and three diesel units, approached the crossing from the west at a speed of approximately 73 miles per hour. The cab of the front power unit was occupied by the engineer and fireman, who were seated on the right and left sides, respectively. The fireman's duty was to keep a lookout ahead.

According to the fireman, he saw the Engel automobile as it was being driven west on old Highway 40; that he did not know it was going to turn until he saw it enter the curve and turn south toward the crossing. In his best judgment, the car was traveling 20 to 25 miles per hour when it was in the curve. At that time he estimated the engine was less than 1,000 feet west of the crossing; more specifically, from 300 to 400 feet. There was nothing obstructing his view of the automobile at that point, nor, in his opinion, was there anything obstructing the Engels' view of the approaching train. He testified the engine was so close to the crossing when he noticed the automobile was going to make a left-hand turn in front of the train that "There wasn't time to do anything about it." He further testified that at the speeds the train and car were traveling, there was insufficient time for him to give a warning to the engineer, or for the engineer to do anything about reducing the speed of the train. The fireman also said when he observed the Engel automobile at the curve he saw the passenger facing toward the driver, and "the man did not look toward the train until just before the car went out of sight under the nose of the diesel engine."

The engineer testified that as the leading diesel unit approached the crossing, the train was running along normally, and that he first observed the Engel automobile when its front end was just north of the track. He estimated the diesel was between 120 to 400

feet west of the crossing at the time. The engineer went for the brake handle and made a "full service continuous application" of the brakes, but the damage was done "before the air ever got set." The diesel unit struck the automobile in the center of the right side, rolling it over to the south and east of the crossing. The train traveled a little over a quarter of a mile before coming to a stop after the impact.

The engineer stated he blew the whistle as the train approached the crossing. This testimony was confirmed by one of the persons residing in the nearby house who said it seemed as if "it was probably two or three seconds from the time of the whistle until I heard them braking." The "bright" headlight of the leading diesel unit was also burning as the train approached the intersection.

There was expert testimony by Max Smith, who was employed by another railroad company as a supervisor of air brakes, with long experience and familiarity with air braking systems on trains, and their capabilities. In his opinion, when there was "full service application," as in this case, the time lapse from when the brake lever was moved into position until there was any effective deceleration of the train would be seven seconds; and in the case of "emergency" application, there would be no effective deceleration for a period of five to seven seconds. Added to these times would be the engineer's reaction time, which would be approximately three-quarters of a second. In his opinion, it would take about 3,000 feet "to stop the train by going to full emergency at 72 or 73 miles per hour." Further, he estimated even if the engine were 300 or 400 feet from the crossing when the automobile was in the middle of the tracks, "the mere shutting off of the engine power by closing the throttle would not give any sufficient retarding force to decrease the forward momentum of the train so as to avoid the collision."

Although the question of whether the driver of the automobile was contributorily negligent was not submitted to the jury as an issue of fact for determination, implicit in the jury's answers to special verdicts Nos. 5 and 6, which found defendants liable under the last clear chance doctrine, is a finding of contributory negligence on the part of Mrs. Engel. Such finding is further reflected by the journal entry of judgment in which the court, pursuant to the special findings of the jury, found generally in favor of plaintiffs, and against defendants. (See, K. S. A. 60-249 [a]; *Bott v. Wendler,* 203 Kan. 212, 453 P. 2d 100.) By resting their right of recovery on the

doctrine of last clear chance, plaintiffs concede that Mrs. Engel was negligent in operating her automobile. (*Goodman v. Kansas City, M. & S. Rld. Co.*, 137 Kan. 508, 21 P. 2d 322, and cases cited therein.) For that matter, we are satisfied the evidence clearly discloses she was contributorily negligent as a matter of law.

The duties of a driver approaching a railroad crossing are set forth in many decisions of this court and need not be elaborated in detail. The established law in this state is that a railroad track is itself a warning of danger; that the duty to exercise care in crossing railroad tracks is a continuing duty; and that a person who attempts to negotiate a railway crossing directly in front of a rapidly moving train, of which approach he is or should be aware, is guilty of contributory negligence. (See *Horton v. Atchison, T. & S. F. Rly. Co.*, 161 Kan. 403, 168 P. 2d 928; *Johnson v. Union Pacific Rld. Co.*, 157 Kan. 633, 143 P. 2d 630; *McCune v. Thompson*, 147 Kan. 57, 75 P. 2d 294; *Vance v. Union Pac. Rld. Co.*, 133 Kan. 11, 298 Pac. 764.)

By way of special verdict the jury specifically found that Florian Engel was contributorily negligent because of his failure to maintain a proper lookout for the driver. The failure of the trial court to set aside these findings forms the basis for plaintiffs' cross-appeal. We find the point without merit, inasmuch as there was evidence the fireman saw the passenger with his back to the oncoming train and facing the driver as the automobile was approaching the crossing, and that the passenger did not look around and see the train bearing down until immediately before the collision.

As a general rule, a passenger has a duty to exercise reasonable care for his own safety, and he is contributorily negligent if he fails to exercise such care by warning the driver of an imminent danger. (*Kendrick v. Atchison, T. & S. F. Rld. Co.*, 182 Kan. 249, 320 P. 2d 1061; *Ross v. Chicago, R. I. & P. Rly. Co.*, 165 Kan. 279, 194 P. 2d 491; PIK 8.91, Comment, and cases cited therein.) The factual situation in the present case bears analogy to that found in *Buchhein v. Atchison, T. & S. F. Rly. Co.*, 147 Kan. 192, 75 P. 2d 280, where the passenger was found to be contributorily negligent as a matter of law. In the court's opinion it was stated:

"Notwithstanding the fact plaintiff was not driving the car, but was merely riding therein, he was nevertheless under a duty to exercise reasonable care and precaution for his own protection. He cannot recover damages when he failed to look for an approaching train, which he could have plainly seen had he looked, and failed to warn the driver of the approaching train. (*Kirby v. Railway Co.*, 106 Kan. 163, 186 Pac. 744; *Knight v. Railway Co.*, 111 Kan. 308, 206 Pac. 893; *Hooker v. Missouri Pac. Rld. Co.*, 134 Kan. 762, 8 P. 2d 394.)

"The fact is inescapable, in the instant case, that if plaintiff had looked to the west betwen the time they shifted the gears and before they reached the track, he would have seen the approaching train. Nothing obscured his vision. He could then have seen the train for a distance of not less than 1,000 to 1,200 feet. There was nothing to have prevented him from warning the driver of the imminent danger. According to his own evidence only one answer is possible. It is that he did not look and hence, of course, did not see the train nor warn the driver of the impending danger. . . ." (p. 195.)

Both the driver and the passenger having been contributorily negligent, plaintiffs nevertheless contend there was sufficient evidence warranting recovery under the last clear chance doctrine. The determination of the propriety of the trial court's action in submitting the case to the jury under the doctrine over defendants' objection, and later rendering judgment pursuant to the special verdicts, requires that the evidence and the inferences which may be properly drawn therefrom be considered in the light most favorable to the plaintiffs.

In a railroad crossing case, as in other negligence actions, a plaintiff who invokes the last clear chance doctrine has the burden of bringing the case within the doctrine. The essential elements of the doctrine are: (1) The plaintiff by his own negligence placed himself in a position of danger; (2) that the plaintiff's negligence had ceased; (3) that the defendant seeing the plaintiff in a position of danger, or by the exercise of due care should have seen the plaintiff in such position, by exercising due care on his part had a clear chance to avoid injuring the plaintiff; (4) that the defendant failed to exercise such due care; and (5) as a result of such failure on the defendant's part plaintiff was injured. (*Gibbs v. Mikesell,* 183 Kan. 123, 325 P. 2d 359; *Ross v. Chicago, R. I. & P. Rly. Co.,* supra; *Goodman v. Kansas City, M. & S. Rld. Co.,* supra.)

The requirement that plaintiff's negligence must have ceased was explained in *Letcher v. Derricott,* 191 Kan. 596, 383 P. 2d 533, where we said:

". . . The phrase means, and perhaps the better term is, 'that the plaintiff had, by her own negligence, placed herself in a position of peril from which she could not extricate herself.' If the plaintiff could extricate herself from the danger, and did not do so, her negligence had not ceased. If the plaintiff could not extricate herself from the danger, her negligence had ceased." (p. 600.)

(Also, see PIK 8.83.)

In support of their position that plaintiffs could not recover under last clear chance, defendants strenuously urge the evidence dis-

closed the negligence of Mrs. Engel, as well as that of her husband, continued up to the very time of the collision and, therefore, the engine crew did not have a last clear chance to avoid the catastrophe. We believe their position is sound.

A fundamental principle of law is that the last clear chance doctrine is inapplicable where plaintiff's contributory negligence continues and is not shown to have ceased. As sometimes stated, there can be no recovery under the doctrine where the negligence of the parties has remained concurrent. (*McElhaney v. Rouse,* 197 Kan. 136, 415 P. 2d 241; *Ross v. Chicago, R. I. & P. Rly. Co.,* supra; *Buchhein v. Atchison, T. & S. F. Rly. Co.,* supra; *Bazzell v. Atchison, T. & S. F. Rly. Co.,* 133 Kan. 483, 300 Pac. 1108; 4 Hatcher's Kansas Digest, Railroads § 145.)

In *Buchhein,* the plaintiff-passenger sought recovery for injuries sustained when the automobile in which he was riding was struck by a train at a township road crossing. He based his case on the doctrine of last clear chance. In upholding the order of the trial court sustaining a demurrer to plaintiff's evidence, this court stated:

"In the instant case plaintiff's negligence, in failing to look and warn, did not only exist prior to entering upon the crossing but continued until the entire car was upon the crossing. He did not look until practically the last moment. In *Gilbert v. Railway Co.,* 91 Kan. 711, 139 Pac. 380, it was said:

" 'The plaintiff was engaged in an active disregard of his own safety up to the last moment when he might have been saved, and consequently has no standing to invoke the doctrine of last clear chance.' (p. 718.)

"Moreover, if the trial court had assumed that plaintiff's contributory negligence had ceased, which the trial court was unable to do in view of plaintiff's own testimony, the fact still remains that plaintiff's evidence did not bring him under the doctrine of last clear chance. His own testimony clearly showed the car was never entrapped or in a predicament from which it could not extricate itself. The motor had not stopped, the car was not stalled, but on the contrary, notwithstanding the fact it had been raining, and the road was slightly slippery, the car picked up speed after they shifted gears. Under the evidence the doctrine of last clear chance was not applicable. (*Tarter v. Missouri-K.-T. Rld. Co.,* 119 Kan. 365, 367, 239 Pac. 754; *Jamison v. Atchison, T. & S. F. Rly. Co.,* 122 Kan. 305, 308, 252 Pac. 472; *Bazzell v. Atchison, T. & S. F. Rly. Co.,* supra.)" (p. 196.)

The *Buchhein* case was cited with approval in *Ross,* wherein the plaintiff had sued to recover damages for the wrongful death of her husband, which occurred in a crossing accident. She was a passenger in a truck being driven by her husband. Plaintiff's sole contention on appeal was that the district court erred in not submitting to the jury the question of whether defendants were negligent under the last clear chance doctrine. The facts were that her

husband stopped the truck 10 or 15 feet from the tracks in order to permit a freight train to pass the crossing. At that point the occupants of the truck had a clear and unobstructed view for 1,500 feet up the track on which a passenger train was approaching. Thereafter her husband proceeded to cross the tracks. After the truck was on the crossing, the driver changed to regular low gear, but found he had to change back to compound low. The truck was going approximately three miles per hour and continuing to move forward, but the passenger train struck it before it cleared the tracks. The contributory negligence of both plaintiff and the driver was conceded. The last clear chance doctrine, as applied to railroad crossing cases, was thoroughly discussed, and this court concluded the evidence was wholly insufficient to justify submission of the case to the jury under the doctrine.

Although not a railroad crossing case, in *McElhaney* we adhered to the principle stated in *Buchhein,* by holding the doctrine of last clear chance inapplicable because the evidence disclosed the cross-petitioner could have extricated himself from peril prior to his injury, and his negligence had not ceased but continued to the time of the collision. His continuing negligence, we said, was at least concurrent with any negligence of the other party against whom imposition of liability was being sought.

There was evidence in the instant case that when the Engel automobile reached a point 73 feet north of the crossing, a driver or occupant had a clear and unobstructed view of the track to the west of at least 1,000 feet. The testimony of the only eyewitness (the fireman) was the Engel automobile appeared to slow down when it started to make the turn to go south toward the crossing and was traveling 20 to 25 miles per hour when it was in the curve. A highway patrolman agreed that the curve could be traversed at such a speed, whereas, if the driver used the sharp turn at the intersection of old Highway 40 and the township road, the maximum safe speed would be 10 to 12 miles per hour. Another patrolman expressed the opinion that because of the small ditch at the curve, the maximum safe speed, either at the curve or at the regular turn, would be 10 to 12 miles per hour; however, he agreed that a car could take the curve at 20 to 25 miles per hour. The undersheriff also testified that the maximum speed across the ditch and around the curve would be about 10 miles per hour. There was no evidence that the speed of the automobile changed after it rounded the curve

and approached the track. There was testimony, however, that regardless of whether the automobile was traveling 10 miles per hour or as much as 25, it could have been stopped within the 73 feet before reaching the tracks.

An automobile going 10 miles per hour travels approximately 14 to 15 feet per second; at 20 miles per hour, 32 feet per second; and at 25 miles per hour, 37 feet per second. The distance from the begining of the curve from old Highway 40 to the railroad track was approximately 150 feet. If the Engel car was traveling 20 to 25 miles per hour, it would have covered the 150 feet in less than five seconds—the last 73 feet being traversed in about two seconds.

The inescapable conclusion from this evidence is that had the driver been keeping a proper lookout, she could have seen the approaching train and would have been able to stop her vehicle in sufficient time to have avoided the collision. A driver about to cross a railroad track is under a duty to assure himself that he can do so safely, and that duty of so assuring himself is commensurate with the possible hazards involved. Had Mrs. Engel heeded the obvious danger and taken the ordinary precautions required of travelers approaching a railroad crossing, there would have been no collision. (*Horton v. Atchison, T & S. F. Rly. Co.*, supra; *Vance v. Union Pac. Rld. Co.*, supra; 4 Hatcher's Kansas Digest, Railroads § 153.) The same may be said with regard to Mr. Engel, for he, too, failed to look for the approaching train, which he could have plainly seen in sufficient time to have warned his wife of the impending danger and thereby have avoided the collision.

The contributory negligence of both Mr. and Mrs. Engel continued unceasingly right up to the moment of the collision, and consequently, the doctrine of last clear chance cannot be relied on as a basis for recovery. In other words, both of them could have extricated themselves from their positions of peril by the exercise of due care, but did not do so; therefore, their negligence had not ceased. (*Ross v. Chicago, R. I. & P. Rly. Co.*, supra; *Buchhein v. Atchison, T. & S. F. Rly. Co.*, supra; *Goodman v. Kansas City, M. & S. Rld. Co.*, supra; also, see, *McElhaney v. Rouse*, supra.)

Even if we assume that the contributory negligence of Mr. and Mrs. Engel had ceased, we find no substantial evidence that time remained in which the collision could, with reasonable care, have been avoided after the train crew saw, or should have seen, the Engels in their positions of danger. The plaintiffs argue there was

adequate time after the engine crew saw that the Engel vehicle was not going to stop but was going to enter the crossing at the same time as the train that they could have retarded the speed of the train sufficiently to have permitted the car to have cleared the tracks. Indeed the jury found the engine crew could have avoided the collision "by reducing speed." In our view the finding is not supported by the evidence.

There was some testimony by the fireman that when he saw the Engel car enter the curve, he "figured that it was going to be occupying the crossing at the same time that the train was going to be occupying the crossing." This, of course, assumes the car would maintain its speed of 20 to 25 miles per hour and the driver would continue her course, oblivious to the presence of the oncoming train. As we have already pointed out, the car was in the curve when the fireman first noticed the passenger was not looking in the direction of the train. When the fireman made these observations he estimated the train was 300 to 400 (certainly less than 1,000) feet west of the crossing, traveling at approximately 73 miles per hour. At that speed the train was going 108 feet per second. If the automobile was 150 feet from the track and traveling, as the fireman said, at 20 to 25 miles per hour at the time he first thought there might be a collision, the train was more nearly 540 feet west of the crossing. Disregarding the time it would take the fireman to notify the engineer of the impending danger, we note the testimony of the braking expert: That when full emergency is applied, there is a lapse of five to seven seconds after the brake lever is moved into position before there is any effective deceleration. Added to this is the engineer's reaction time of approximately three-quarters of a second. In this six- to eight-second interval the train would travel between 620 to 840 feet without any time lapse being considered for the fireman to notify the engineer. The Engel automobile would have already reached the crossing. Under the circumstances, there could not have been any significant reduction in the speed of the train which would have permitted the car to have safely passed over the crossing. Although the engineer testified he could have possibly seen the Engel automobile coming down old Highway 40 when the train was 1,000 feet from the crossing, he did not see the car, because he was looking at the crossing. Even had he seen the car when it was in the curve and turning south onto the township road, he had a right to assume the driver had taken note of the approaching train and would not drive in front of it. The relative

rights and obligations of the train crew and travelers on the highway are fully discussed in *Ross v. Chicago, R. I. & P. Rly. Co.,* supra. (Also, see, *Vance v. Union Pac. Rld. Co.,* supra.) In simple terms, after the fireman realized the automobile was not going to stop, he did not have time to warn the engineer so that there could be an effective application of brakes in the time available; and further, there was no dereliction of duty on the part of the engineer whereby he could have avoided the collision.

We have examined the authorities cited by plaintiffs in which a careless plaintiff has been allowed to recover under the doctrine of last clear chance when he is not incapacitated or physically helpless but merely inattentive to impending danger. They are not persuasive, in view of our prior case law and the factual situation here. Under the evidence there was insufficient time in which the train crew, in the exercise of due care, could have reduced the speed of the train and avoided striking the automobile.

From what has been said, we hold that plaintiffs have failed to sustain the burden of bringing their case within the doctrine of last clear chance. The judgment of the trial court must be reversed.

It is so ordered.