No. 45,918

RONALD J. BACON, by and through his father and natural guardian, JIMMY LEON BACON, *Appellee,* v. JACK H. WERNER, *Appellant.*

(484 P. 2d 1020)

Opinion filed April 10, 1971.

*Edward F. Arn,* of the firm Arn, Mullins, Unruh and Kuhn, of Wichita, argued the cause and was on the brief for the appellant.

*Jacob S. Graybill,* of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an appeal by a host driver defendant from a judgment recovered by a guest passenger plaintiff. The judgment was rendered on a jury finding of gross and wanton negligence. The principal contention is that the evidence is insufficient to warrant a finding of gross and wanton negligence.

The automobile accident, which gave rise to this litigation, occurred about 2:15 a. m. on February 2, 1968, on a north-south road known as South Clifton Street, in the eastern part of Wichita.

Plaintiff and defendant were roommates in the barracks at the McConnell Air Force Base where both were stationed while on duty in the United States Air Force.

The events of the evening preceding the accident were established by the testimony of plaintiff, the only eyewitness, who testified at the trial. Defendant had acquired his automobile about three weeks prior to the date of the accident. On the evening in question plaintiff and defendant left the Air Base about 7 p. m. in defendant's automobile to go "shoot pool." They went first to the Kellogg Lounge where they "shot pool" and "drank beer"; then to the Clown Lounge where they continued to "shoot pool" and "drank beer" From the Clown Lounge they proceeded to the Star-

dust Club. They left the Stardust Club about 2 a. m. the following morning. They were undecided about where to go next. The King's-X and Ramada Inn were mentioned. Defendant was normal —nothing to indicate he was intoxicated. Defendant drove east on 47th Street until he came to South Clifton Street.

Plaintiff did not remember ever being on South Clifton before and did not know that defendant had ever driven on the street. Plaintiff testified on direct examination as follows:

"When we turned onto South Clifton we were going North. As we traveled north on South Clifton the radio was on. It wasn't too loud, just so you could hear it; and we talked a little bit, but not too much—just now and then— I think, about shooting pool. I don't know of anything of any significance. It was not a steady conversation. As Mr. Werner (the defendant) turned north on South Clifton, he was driving normal—nothing wrong with his driving.

"Q. At the time, did you have any occasion to view the speedometer?

"A. No, I didn't pay any attention to it.

"Q. Do you have any idea how fast he was driving?

"A. I'd estimate the speed at 45 or 50, but it would just be a guess. I didn't look at the speedometer.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"The houses are all along the road as far as the road goes. We were going north and we came to that corner—I wasn't watching the road—I didn't see it. The 'corner' I refer to is the turn in Clifton.

"Clifton goes up here (indicating) and then makes a turn and intersects with K-15.

"We went off the road just at the start of the turn, just as close as I know. He (the defendant) didn't negotiate the turn;—and then he went—as far as I know, he went—just at the start of the turn he went straight on. I first noticed any danger just a second before it happened. I didn't see it until it was there. Just prior thereto I was not paying any attention to the road. I must have been looking at something in the car or paying attention to something in the car— maybe the radio or something like that—I'm not sure. I have no clear recollection of what happened as we went off the road. I just seen the turn in the road just as we were right there.

"I don't know exactly where we went off the road and the curve. After the crash the next thing I remember was waking up in the hospital at McConnell Air Base sometime the next day. I had a cut on my forehead. . . ."

On cross-examination plaintiff admitted that he had previously made a statement that "He [defendant] drove as I would have driven"; that he [plaintiff] had no reason whatsoever to warn defendant about his driving prior to the accident.

Plaintiff testified that:

"I don't think that I would have went off the road, but I can't say so.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"From where we turned onto Clifton to the curve (where the accident oc-

curred) it is almost a mile—maybe not quite a mile. I estimated the speed of our car at 45 or 50 miles per hour. At this time, that is my best opinion as to the speed."

Several officers on the staff of the Sedgwick County Sheriff's Department described the scene of the accident. Their testimony, as it appears in the light most favorable to plaintiff, may be summarized as follows:

When proceeding north on South Clifton toward the scene of the accident there are ten or eleven luminous reflector face signs on each side of the road, or a total of twenty or twenty-two, indicating a curve ahead. The testimony disclosed that a substantial change had been made in road markers subsequent to the accident in question.

Officer Davison, of the Sedgwick County Sheriff's staff, testified that there was a sign which said "Slow, Dangerous Curve" that did not have a "curve arrow" on it; that there were probably ten reflector signs on each side of the road, a total between twenty-five and thirty, which "are 6 inches wide and maybe 18 to 24 inches long, black and white, and when light shines on them, they shine." The reflector signs did not continue around the perimeter of the curve.

Davison further testified that a barricade sign south of the curve, which appeared in the photograph offered in evidence, was not there at the time of the accident; and that the "Dangerous Curve Ahead" signs have always been there but were more clearly marked at the time of the trial than they were at the time of the accident. The photograph referred to was later stricken by the trial court. Davison also testified that after the automobile left the embankment at the curve, it went through the air about 98 feet and hit the ground again; and that the point where the automobile came to rest is about twenty feet below the embankment where it left the roadway. He further testified that there have been six or eight other accidents at the same place in the past three or four years. They all happened the same way—going off the embankment.

Officers Greenfeather and Schooler, as they were proceeding to the scene of the accident, found defendant running across the road. They stopped defendant and questioned him. Defendant first denied that he had been in an accident and stated that he had been robbed and was en route back to the Air Force Base for help. Defendant later admitted the accident and stated that he had been injured

in the neck. The officers took defendant to the scene of the accident in their patrol car.

Officer Schooler testified that defendant had obviously been injured and that when they arrived at the scene of the accident "He [defendant] appeared to have suffered some type of seizure and he fell out of the patrol car. I put him on the stretcher."

The officers made out an official accident report which was received in evidence when offered by plaintiff. In the report, the accident was described in these terms:

"Vehicle was headed north on Clifton Ave. Failed to reduce speed for curve, went over embankment."

Speed was estimated at sixty-five miles per hour and drinking was indicated as an accident factor in the report.

It may be said at this point that plaintiff, by his own testimony, as well as by the statement of defendant, established that defendant's driving was not affected by beer consumed. No contention in this regard is made by plaintiff. Therefore, the question of intoxication is not material in considering the evidence on appeal.

Doyle Lacy, who lived nearby, was awakened by the noise of the accident; he looked out his bedroom window and saw that a car had missed the curve. Lacy said he saw defendant pulling plaintiff from the passenger's side of the front seat; that defendant was "pretty well covered with blood," and said an ambulance was not needed. Nevertheless, Lacy walked back up the enbankment and told his wife to call an ambulance. When Lacy returned to the automobile defendant was gone. Lacy did not see defendant again until he returned with the officers.

Lacy further testified that he had observed other vehicles driving down that embankment, mostly young boys driving down the embankment to get to a vacant lot beyond.

At the close of his evidence, plaintiff offered a statement made by defendant which reads:

". . . I was headed north on Clifton after turning left from 47th Street going to K-15. I had just put out my cigarette, glanced at my speedometer, which read 50 miles m. p. h., and looked up and the road curved to the right. I hadn't seen any speed signs or sign of a curve and started to take the curve, but seeing a telephone pole and deep ditch, I swerved back hoping to ride out whatever was ahead which looked fairly good. Here follows the explanation: I bounced once, maybe twice, then the door flew open, the car slammed to a stop. My seat belt gave way. I started to go out, but kept ahold of the steering wheel which then gave way, and I rolled out and away from the car. . . ."

As medical evidence, plaintiff submitted the testimony of Dr. Rex Lee, who examined plaintiff on October 7, 1968. Dr. Lee's examination disclosed a compression fracture of the fourth lumbar vertebra in plaintiff's lower back. Dr. Lee testified that plaintiff may need "a surgical procedure" which might improve plaintiff's condition, and that probably a fusion was the procedure indicated.

Defendant called only one witness, Dr. Antonio Ramirez, who was the senior surgeon at the Air Force Base Hospital. Dr. Ramirez examined plaintiff and treated him following the accident. Plaintiff was hospitalized for five days at the Base Hospital and was then released to active duty. Dr. Ramirez reexamined plaintiff on March 26, 1968, and found a compression fracture of the low back area. Plaintiff was given diathermy and exercises to strengthen the muscles around that part of his spine.

Plaintiff was discharged from the Air Force in July 1968.

Apparently, defendant was discharged from the Air Force and left Kansas prior to the filing of this lawsuit in July 1968. Defendant's counsel states that he has never been able to contact defendant, although diligent effort was made. Counsel states that he is defending the action at the request of defendant's insurance carrier, who is defending the action under a reservation of rights.

The case proceeded to trial before a jury on March 10, 1969. At the conclusion of plaintiff's evidence, defendant's motion for judgment was overruled. Defendant renewed his motion at the conclusion of all the evidence and it was again overruled.

The jury answered special questions and returned a general verdict for plaintiff.

Defendant's posttrial motions were overruled and this appeal followed.

It is conceded that plaintiff was a guest of defendant within the purview of the provisions of our so-called guest statute K. S. A. 8-122b. Hence, the crucial question framed by defendant's contentions on appeal is whether the evidence, together with all inferences which might be fairly drawn therefrom, viewed in the light most favorable to plaintiff, tends to establish gross and wanton negligence to the extent that warranted submission of the issue to the jury.

The meaning of gross and wanton negligence, within the context of our guest statute, has been considered by this court in many cases. The most recent being *Reynolds v. Estate of Stanosheck,*

206 Kan. 714, 482 P. 2d 440. In *Reynolds* the issue on appeal was presented in a frame of reference so analogous to that in which the issue is presented here, that we believe our decision in *Reynolds* controls the disposition of the instant appeal.

In *Reynolds* the host driver, defendant Stanosheck, who was killed in the accident, drove his automobile squarely in front of a slowly moving train, when the whistle was blowing and the bell was ringing, and there was nothing to obstruct his view. However, there was no direct evidence that Stanosheck either heard or saw the train before the crash. None of the surviving passengers in the car saw or heard the train. There was no evidence that any of his passengers had complained about Stanosheck's driving prior to the accident. We had this to say concerning the conduct of Stanosheck:

". . . In short, there is no evidence in the record to indicate he realized the imminence of danger, or upon which a reasonable inference could be based that he possessed an attitude of reckless disregard and complete indifference for the well-being of his close friends. The most that can be said from the evidence in the record is that he failed to keep a proper lookout. He had a duty to look before proceeding over the crossing (*Sander v. Union Pacific Rld. Co.*, 205 Kan. 592, 470 P. 2d 748), and he will be conclusively presumed to have seen what he could and should have seen. (*Mies v. Twietmeyer*, 193 Kan. 97, 99, 392 P. 2d 118.) At most, Stanosheck's failure to keep a proper lookout constituted lack of due care, which is ordinary negligence, and less than gross and wanton conduct."

In *Reynolds* we quoted this court's definitions of gross and wanton negligence within the meaning of our guest statute, as stated in leading cases dealing with the subject. The cases cited are applicable here and specific references will not be reiterated at this early date.

It will suffice to say that since *Stout v. Gallemore*, 138 Kan. 385, 26 P. 2d 573, this court has consistently held that under the provisions of the statute a plaintiff guest must show conduct on the part of defendant driver indicating that he was willing to injure the passengers in the automobile, or that with a realization of imminent danger he was so indifferent to the consequences as to amount to a willingness to injure.

In the instant case plaintiff and defendant were the only eye-witnesses. Plaintiff testified he had no reason to complain about defendant's driving, that defendant drove as plaintiff would have driven; defendant's driving was normal, nothing wrong with it. Plaintiff did not see any warning sign nor did he see the curve

until they were right there. Likewise, according to defendant's statement put into evidence by plaintiff, defendant saw no speed or curve signs until he was in the curve when he saw "a telephone pole and deep ditch" and "swerved back hoping to ride out whatever was ahead."

In several respects, the evidence here is weaker in support of gross and wanton negligence than that adduced in *Reynolds.*

In *Reynolds* there was evidence that Stanosheck had visited Marysville on numerous occasions and was aware of the railroad crossing. There was also testimony by a Marysville Policeman that in the twenty-one years he had been a policeman there had never been a previous train-car collision at the crossing. In the instant case the evidence discloses that defendant was not a native of Wichita; that he had only had his automobile for three weeks; and there was no evidence that defendant had ever been on South Clifton Street before the accident. There was testimony here that on the issue in question there had been six or eight accidents, which happened in the same way during the past three or four years.

In the instant case there is nothing whatsoever in the testimony of plaintiff, or in the statement of defendant—the two eyewitnesses, to the effect that defendant had knowledge of the actual danger and displayed such indifference to the possible consequences, as would constitute a willful and wanton disregard of plaintiff's rights and feelings. As in the case of the driver in *Reynolds,* the most that can be said from the evidence in the record here is that defendant's failure to keep a proper lookout amounted to lack of due care which is ordinary negligence and less than gross and wanton conduct.

Plaintiff relies heavily on our decision in the recent case of *Pickens v. Maxwell,* 203 Kan. 559, 456 P. 2d 4, wherein we held plaintiff's evidence had established a submissible case of gross and wanton negligence. In *Pickens* defendant drove through a stop sign onto a State Highway which had a speed limit of "70 miles per hour." There were no eyewitnesses to the accident. The rationale of our decision is expressed in these words:

"Under the facts and circumstances of the present case, it would appear that the appellee (1) had a realization of imminent danger and (2) it could be inferred that he proceeded with reckless disregard, indifference and unconcern for probable consequences.

"The evidence is not disputed that Maxwell had lived in the Tonganoxie

area all his life. He was familiar with the intersection of Highway K-32 and Eudora Road and traveled over it frequently. He was aware that a stop sign controlled southbound traffic at that intersection. He was aware that a person could not see eastbound traffic on Highway K-32 until that person was within a few feet of the stop sign north of the intersection. He knew the speed limit was 70 miles per hour on Highway K-32.

"With this knowledge of imminent danger, the appellee approached the intersection, passed the stop sign and entered the intersection at a speed in excess of 20 miles per hour. He exposed his passengers to injury by any automobile approaching the intersection from the west. There was one." (p. 564.)

The components of evidence enumerated in *Pickens* which were said to establish, on the part of defendant driver, a realization of the imminence of danger, and to form a basis for the drawing of an inference of reckless disregard for probable consequences, are totally lacking in the instant case.

Plaintiff argues the conduct of defendant after the accident in leaving the scene, in initially denying the accident to the officers, and in asking Lacy not to call an ambulance, is such that the jury might infer a mental attitude sufficient to establish wantonness. Plaintiff cites *Muhn v. Schell*, 196 Kan. 713, 413 P. 2d 997, wherein it was held that the mental attitude of the wrongdoers may tend to establish wantonness. In the *Muhn* case there was evidence the driver Schell was irritated because of the seating arrangement, which put his girl friend in the back seat next to a competing suitor. There was testimony that Schell drove in a reckless manner and ignored remonstrations from his girl friend "to slow down and quit goofing off." The mental attitude indicated by the testimony in the *Muhn* case cannot be inferred from the evidence of the after the fact conduct in the instant case. The evidence here is that plaintiff and defendant were friends, had spent a congenial evening together, and that plaintiff had no reason to, nor did he at any time, complain about defendant's driving. Plaintiff's testimony that defendant drove "as I would have driven" negates any inference of active or purposeful intent on the part of defendant, or that defendant was conscious that his conduct would likely result in injury to himself or his guest.

At the conclusion of the trial in the instant case two special questions were submitted to the jury. The jury answered question No. 1 by finding the defendant guilty of gross and wanton negligence. Question No. 2 and the jury's answer thereto read as follows:

"If you have answered Interrogatory No. 1 in the affirmative, then please state and name the specific act or acts of the defendant, Jack Werner, which you find do constitute such gross and wanton negligence.

"ANSWER: The statement of the defendant was rejected in that he saw no warning signs of danger ahead. It is our belief that the defendant, Jack Werner, saw and ignored the warning of the numerous caution signs and the accident was the direct result of this wanton neglect."

Plaintiff claims there is substantial evidence to support the jury's answer to question No. 2 and that it in turn supports the verdict for plaintiff.

We have already demonstrated that the evidence adduced fails to establish gross and wanton negligence. This conclusion effectively disposes of this appeal. Nevertheless, we would make this further observation concerning the jury's answer to question No. 2

The statement of defendant, referred to by the jury, was not offered in the form of testimony by defendant, but was a pretrial statement of defendant, secured by plaintiff and offered into evidence by plaintiff as an integral part of his case. The only evidence bearing on the question whether defendant saw warning signs was his statement that he did not, and testimony by plaintiff that he did not believe defendant saw the curve or signs.

Under the circumstances attendant here, we believe the rejection of defendant's statement in the answer to question No. 2 was beyond the prerogative of the jury. It is fundamental, of course, that ordinarily the trier of the fact is not required to believe the testimony of any witness merely because there is no direct testimony to controvert it. Here, however, defendant's statement was relied upon by plaintiffs as an integral part of his evidence, and read into the record as a part of his case in chief. The possibility that defendant's statement was untrue is not suggested by any evidence in the record. In fact, the probability of the truth thereof is supported by the evidence of six to eight similar accidents on the same curve. The applicable rule is found in *Gibbs v. Central Surety & Ins. Corp.,* 163 Kan. 252, 181 P. 2d 498, wherein it was held:

"Ordinarily the trier of the fact is not required to believe the testimony of any witness merely because there is no direct testimony to controvert it, but where plaintiff produces two witnesses who testify on every, material element of plaintiff's cause of action, and such testimony is not inherently improbable or uncandid, and the cross-examination does not develop any conflict, and the defendant produces no testimony in opposition, the trier of the fact is not justified in arbitrarily or capriciously disregarding such testimony." (Syl. ¶ 2.)

See, also, *Irvin v. Irvin*, 182 Kan. 563, 322 P. 2d 794; and *Reeves v. Child*, 165 Kan. 341, 194 P. 2d 919.

In the light of the record here, the rejection of defendant's statement cannot be justified.

In view of our disposition of the appeal, it is unnecessary to discuss other points raised by defendant.

The judgment is reversed with directions to enter judgment for defendant.