No. 43,744

JAMES G. WINN, as Trustee of the Millers Profit Sharing Trust, *Appellee*, v. SAMPSON CONSTRUCTION CO., INC., a Corporation, *Appellant*, v. JAMES G. WINN and ABILENE FLOUR MILLS COMPANY, a Corporation, Defendants to Cross Petition, *Appellees*.

(398 P. 2d 272)

Opinion filed January 23, 1965.

*Wayne Coulson*, of Wichita, argued the cause, and *John Jay Darrah, Phillip S. Mellor, Charles A. Sparks, Jr., Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Willard B. Thompson* and *David W. Buxton*, all of Wichita, and *Homer V. Gooing* and *Hugo T. Wedell*, of Counsel, were with him on the briefs for the appellant.

*Robert N. Partridge* of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout, Ronald K. Badger* and *Benjamin C. Langel*, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This was an action for damages for alleged negligence in designing and constructing a grain storage elevator which resulted in a partial collapse of the structure.

The facts as disclosed by the testimony, which was necessarily extensive and highly technical, will be summarized.

In 1958, the plaintiff, James G. Winn, was named as a trustee of a profit-sharing trust which was formed for the benefit of officers, administrative and clerical employees, and salesmen of the Abilene Flour Mills Company and another related enterprise. In the summer of 1958, the trust entered negotiations with the Sampson Construction Co., Inc. (hereinafter called Sampson), for the erection of a two million bushel grain storage facility on real estate owned by the trust, directly across the railroad tracks from the Milling Company operations. Due to the fact that the trust was new Sampson asked for and secured a guaranty from the Milling Company to insure the financial aspects of the contract.

Sampson had erected other grain elevators for other companies associated with the Milling Company. In past contracts Sampson had used its printed form of agreement similar to or identical to the instant one. While this form contract provided that the responsibility of soil conditions rested upon the owner, no soil testing had been done in past years. The earlier structures had settled, however, and settlement was to be expected in a structure of this kind in carrying the heavy load. The real estate upon which the proposed structure was to be erected was transversed by a main city sewer line of the City of Abilene. The parties were concerned about limiting the amount of settlement so as not to interfere with the operation of the sewer line. Therefore, soil testing was arranged by Sampson with the Oklahoma Testing Laboratories in an effort to determine what settlement should be anticipated. A report from that company was not promptly forthcoming and a second test was arranged for by Sampson with Paul Garber of Kansas City, Missouri. The trust reimbursed Sampson for the costs expended by it to the Oklahoma Testing Laboratories and by agreement reimbursed Sampson for one-half of Garber's costs.

The written agreement entered into by the parties expressly provided that plans and specifications were attached to it. However, in actuality, neither plans nor specifications were then in existence and the plans were actually drawn and amended in the ensuing

months, as the construction progressed, but long after the contract was signed.

Sampson moved on the job site immediately after the contract was signed between the parties and commenced preparing forms to be used in the erection of the structure. On October 20, 1958, Sampson was advised by telephone by Garber that the load he had intended placing upon the soil was in excess of the capability of the soil. Thereafter, Sampson reported this conclusion to the trust and Milling Company and there then followed a discussion of what course to take. Representatives of the trust suggested building on different ground but Sampson discouraged this. The question of piling was discussed but was ruled out by Sampson. Thereafter, Sampson agreed to return to its office and to come up with a proposal after consulting with its engineering staff. In succeeding days Sampson returned with a drawing or sketch of a type of foundation that it represented would accomplish the objective of building the structure at the proposed site. The cost of this addition was negotiated and it was then agreed that the trust would pay $65,000 in addition to the $750,000 previously agreed upon. The subsequent agreement proposed the addition of a slab extension to extend an additional eight or thirteen feet beyond the perimeter of the upright bin walls. Sampson felt that the extension should be an additional thirteen feet and on its recommendation that this was more desirable, the additional money to be paid to Sampson was agreed upon. Sampson stated that he had employed this design previously. Subsequently Sampson prepared and forwarded to the trust a supplemental agreement reflecting the additional money to be paid. Sampson designed the new foundation around the Garber report and told the trust representatives that by so doing: "We will have a good, safe elevator."

Construction then continued through the winter months of 1958, and 1959. Loading and testing commenced in the late spring and early summer of 1959, under the supervision of Sampson employees. While in progress certain difficulties were noted in a car tunnel under the structure and Sampson's attention was called to it. Remedial action was undertaken by Sampson for this problem. Later it was noted that the elevator was tipping slightly to the south. This was not unusual and Sampson employees gave directions to transfer the loading on a systematic basis to the north bins and then the east and west bins. As this was being accomplished there occurred suddenly and violently a failure in the bin walls on the

bins on the north at the extreme west end. This phenomenon continued for several hours and was characterized by the crumbling and popping of the north wall of the north bins at intervals until the failure had occurred along the entire north side of the elevator into and including the eastern-most bins.

Emergency measures were undertaken immediately by all of the parties and as a part thereof the parties promptly agreed to employ a soil stabilization contractor to undertake the pumping of grouting cement under high pressure into the soil immediately under the structure. This process continued for the ensuing months during which time the vertical bin walls that had failed were removed and replaced. The structure today is in operation although it is badly damaged and there was testimony that it is subject to having further trouble.

The petition alleged that the defendant negligently designed and built the foundation of the structure and claimed damages as follows:

"As a proximate result of defendant's negligence, plaintiff has been damaged in losses to the structure in the amount of $411,531.23 expense in moving and loss of grain in the amount of $7,400.00; damage and replacement of sewer in the amount of $2,500.00; and loss of profits in the amount of $201,610.68 as hereinbefore itemized. [Less $100,000 due on contract price.]

"Wherefore, the plaintiff prays judgment against the defendant for the sum of $523,041.91, and for the costs of this action. . . ."

The defendant answered with a general denial and cross petition for the balance due on the contract in the amount of $100,000 and $116,682.75 for stabilization and rehabilitation of the elevator.

The jury answered special questions and returned a verdict in favor of the plaintiff in the sum of $274,529 less $100,000 due on the contract. The verdict was reduced to judgment and the defendant has appealed.

The appellant first contends that "there was no evidence that the negligence found by the jury could have been the proximate cause of the failure."

The jury answered special questions as follows:

"No. 1. If you find that failure of the elevator was caused by soil conditions, do you find that such conditions were known or should have been reasonably anticipated from the reports available to defendant?

"Answer: Yes.

"No. 2. If your answer to question 1 is affirmative, do you find that defendant negligently designed the elevator in view of such knowledge?

"Answer: Yes.

"No. 3. If your answer to question 2 is affirmative, state in what particular the design was negligent.

"Answer: Negligent in the design, engineering, and construction of the slab, specifically in the lack of tying in of the steel in the bottom of the cantilever and in addition, the inadequate amount of steel reinforcement."

The chief objection is directed to the answer to question No. 3.

It cannot be argued there is not ample evidence to support a finding of negligence in the designing of the elevator. The testimony generally was to the effect that the slab or cantilever design tended to increase rather than decrease the hazard to be avoided.

An investigation into the cause of the failure was undertaken three days after it occurred by a nationally recognized firm of engineers. One of the senior engineers of the firm testified that the failure was the result of faulty design. It was his opinion that the foundation slab extension—the thirteen foot apron subsequently incorporated into the design—created a problem which caused the failure. This slab extension induced a condition that caused the slab to flex or bend in the center where the load was, resulting in the entire load being carried by the outer bin walls, which in turn were incapable of carrying it. The flexing or deformation of the footing resulted in a crack that extended the entire longitudinal distance of the structure. The downward bowing of the center of the slab was made inevitable by the absence of re-enforcing steel in the slab at the point where the bowing and crack occurred. It would have taken two and one-half times as much steel to properly resist the stresses.

A second structural engineer and one who had actually designed scores of grain storage facilities, including ones much larger than this one, believed that the failure was a result of faulty design. The foundation was not structurally stable. The use of the extension to spread a load backfires by creating a bending movement under the center of the structure which, in effect, creates a hinge permitting the center of the slab to bend and break. The failure would have occurred on any type of soil.

Appellant makes no objection to the general finding of negligence in the design, engineering and construction of the slab but objects to the particulars found by the jury in which there was negligence in the design. Appellant states:

"There was absolutely no testimony that the slab would have been one iota more rigid by use of increased steel and tying in the bottom of the slab. . . ."

We cannot agree with appellant's contention. There was engineering testimony as follows:

"A. (continuing) the thing actually cracked. There was a very high stress. In the bottom of that slab. And there was no steel there. This undoubtedly resulted in the crack.

"Q. In other words, there wasn't enough steel that carried clear through, and across, that bottom, to carry the weight of that—normal weight of that elevator, was there?

"A. It did not have enough strength to resist the forces. Right."

There was additional testimony:

"Q. Would you ever, as an engineer, have approved such a design?

"A. Absolutely not.

"Q. In the placement and size of the steel used in this drawing, I will ask you if it was used and placed in accordance with good engineering design and practice?

"A. No sir.

"Q. Was the design as used in the blueprints, and as used in the construction, one in acceptance with good engineering design and practice?

"A. Absolutely not.

"Q. In your opinion, sir, as an engineer, was the design used, a safe design?

"A. No, sir.

"Q. Would you say this was negligently designed?

"A. I would say that this was negligently designed, and it was designed to fail."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. It would take approximately two and a half times as much steel as what they had in there, to properly resist the stresses; and so that it would be within the stresses you are allowed to use in a good standard engineering practice.

"Q. So it was weak by two and a half times?

"A. Yes.

"Q. At that point?

"A. (no audible answer.)

"Q. Right? Is that right?

"A. (witness nodding head in up and down direction.)

"Q. Now, had it hooked on to anything that carried out across in the two foot area, would it have strengthened it somewhat?

"A. It would have strengthened it somewhat. Yes."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

".   .   . If that was better soil, it would still break. It would break simply because with this type of design, there is no way to prevent this flexion. And as long as it flexes *and loses contact with the bottom of the bin,* the entire tremendous load there, is transferred on these edges. That crushes it, and that is the end of it. .   .   ." (Emphasis supplied.)

We have not attempted to present even a small part of the testimony presented in a voluminous record which indicates negli-

gence in the design and construction of the elevator. We do not have the responsibility of demonstrating the preponderance of the evidence. This court searches the record for the purpose of determining whether there is any competent evidence to support the findings and verdict. If so this court will not weigh the evidence. Findings of fact determined on conflicting evidence are conclusive. (*Kramer v. Farmers Elevator Co.*, 193 Kan. 438, 393 P. 2d 998.)

The appellant further complains that there was error in the admission of evidence as to the loss of use of the elevator because the elevator was leased to the Abilene Grain Co. and the lease contained no provision for abatement of rent for any cause whatsoever. Appellant contends that the cause of action for loss of use vested exclusively in the lessee, and that the cause of action was in tort and not assignable.

There might be some merit to appellant's contention had the structure been suitable for the purpose for which it was rented but was rendered unsuitable by a trespassing third party and there was no provision in the lease for abatement of rent.

In the instant case the appellee was suing the appellant for a breach of warranty that it would properly design and construct a grain elevator. The failure of the appellant to properly design and construct the elevator had caused appellee to rent to the Abilene Grain Co. a structure which was not fit for the purpose for which it was rented.

Under date of May 27, 1960, Abilene Grain Co. and appellee Winn entered into a contract. This contract provided that Abilene Grain Co. would defer its claim for a refund of the rentals paid for the year ending May 31, 1960, pending disposition of his suit against appellant. Appellee Winn agreed that he would refund to Abilene Grain Co. an amount based upon "proportion of occupancy of the facilities usable by us throughout the period of repair" payable out of the proceeds of judgment or settlement of Winn's claim against appellant.

The appellant contends that as a matter of law the Abilene Grain Co. had no claim for refund of rent. It cites 52 C. J. S., Landlord and Tenant, § 486, p. 255, which reads in part:

At common law a lessee of premises which are accidently destroyed subsequent to the making of the lease cannot be relieved from an express covenant to pay rent, unless he has stipulated in the lease for a cessation of the rent in such case, or the lessor has covenanted to rebuild. Also equity will not relieve from an express covenant except in case of fraud, accident, or mistake.

In some jurisdictions a view at variance with the general rule has been taken. The rule is apparently more favorable to the tenant under the civil law than under the common law. . . ."

We also note the statement in 51 C. J. S., Landlord and Tenant, § 303, p. 960:

"In the absence of fraud or concealment by the lessor of the condition of the property at the date of the lease, there is no implied warranty that the premises are tenantable or even reasonably suitable for occupation, and the rule of caveat emptor applies, and under such circumstances the tenant ordinarily is deemed to take the premises as he finds them, having a duty to investigate for himself, and assuming the risk of structural defects, except such as he could not discern with reasonable diligence and with a knowledge of which the landlord is chargeable. There is no implied warranty that the premises are safe, or that their physical condition shall remain unchanged during the term of the lease, and no implied covenant or duty rests on the landlord to maintain the premises in a safe and tenantable condition. . . ."

It should be noted that the common-law rule as quoted above has not been without criticism in this jurisdiction. In *Saylor v. Brooks*, 114 Kan. 493, 220 Pac. 193, it was stated at page 494:

". . . The common-law rule holding the tenant to the payment of rent after that which makes the contract of value to him has ceased to exist is criticised in an often-cited opinion written by Mr. Justice Brewer, in a case which was decided upon another phase. (*Whitaker v. Hawley*, 25 Kan. 674.)"

In *Whitaker v. Hawley*, cited in the above opinion, it was held:

"*Quaere*, is the doctrine of the old common law that, upon a covenant to pay rent in a lease of lands and buildings for a term of years, the rent may be recovered notwithstanding the total destruction by accidental fire of the buildings, in force in this state?

"Even if this common-law doctrine be in force, yet where, by a single instrument, real and personal property are leased for a gross rental, and the personalty is a substantial part of the leased property, upon a total destruction by accidental fire the lessee is entitled to an abatement of the rent equal to the proportionate rental value of the personalty." (Syl. 1 and 2.)

We do not propose to enter into a lengthly discussion as to the general right to the abatement of rent and the right to sue in connection therewith on the failure or partial failure of a rented structure but rather limit our decision to the particular facts and circumstances of the present case.

We conclude that where, through faulty construction, a grain elevator has hidden defects which renders it unfit for the extent of the use for which it was rented, the lessee has the right to a reasonable abatement of the rent and the lessor can, under an agreement such as described above, join damages for loss of use

in an action against the contractor for breach of a covenant to properly design and construct the elevator.

The extensive record has been carefully considered in connection with other alleged errors and we find no trial errors that would require the granting of a new trial.

The judgment is affirmed.

APPROVED BY THE COURT.