No. 45,893

SHIRLEY J. GARST, TINA MARIE GARST, KELLI LANAY GARST, by and through their mother, SHIRLEY J. GARST, their duly appointed guardian and conservator, JOHN ROY BENTON, JERRY HANCOCK, LIBERTY MUTUAL INSURANCE COMPANY, a Corporation, *Appellees,* v. GENERAL MOTORS CORPORATION, *Appellant,* and LYLE BASKINS, *Defendant.*

(484 P. 2d 47)

Opinion filed April 10, 1971.

*Thomas V. Koykka*, of Arter & Hadden, of Cleveland, Ohio, argued the cause, and *Richard C. Hite*, of Kahrs, Nelson, Fanning, Hite and Kellogg, of Wichita, was with him on the brief for the appellant.

*Donald Newkirk*, of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Philip Kassebaum*, of the same firm, *Arthur Relihan* and *T. D. Relihan*, of Relihan, Relihan and Relihan, of Smith Center, and *John Prather*, of Wichita, were with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is a products liability case wherein the plaintiffs in the trial court won a verdict in the total sum of $118,401.54 for death and injuries caused by the operation of a 40-ton "Euclid" earth mover manufactured by General Motors Corporation.

The issue tried in the lower court, material to the appeal, is whether General Motors was guilty of negligence in designing the braking and steering systems on the "Euclid" earth mover.

The question on appeal is whether there is any substantial competent evidence to support the jury's finding that General Motors was negligent in designing the braking and steering systems on the "Euclid" earth mover.

The law upon which the foregoing issue was tried in the lower court is given in instruction No. 8 as follows:

"A manufacturer has the duty to use reasonable care in the design of his products so that they will be reasonably safe for their intended use, including any emergencies of use which can reasonably be anticipated.

"A manufacturer is not, however, required to design products so that they

are foolproof or incapable of producing injury. Neither is he required to incorporate only features representing the ultimate in safety in his design.

"It is for the jury to determine from all the evidence in a case, whether or not a manufacturer used reasonable care under the circumstances then existing to design its product in such a way that it did not create an unreasonable risk of injury to the user or others, when used in a reasonably anticipated manner."

General Motors' challenge to this instruction in its motion for a new trial was overruled by the trial court, but the law stated in the first two paragraphs of the instruction is not challenged on appeal. The first two paragraphs of instruction No. 8, therefore, become the law of the case.

Negligent design was considered by this court in *Winn v. Sampson Construction Co.,* 194 Kan. 136, 398 P. 2d 272.

The facts material to our review are not in dispute.

The vehicle involved in the accident is an earth-moving scraper, referred to also as the TS-24, or as the General Motors Euclid scraper, shown in the photograph.

The vehicle is of enormous proportions, being at the outer limits of size presently designed for earth-moving equipment. It measures 44 feet 3½ inches long, is 11 feet 10 inches wide, is 11 feet 3½ inches tall, and weighs approximately 40 tons empty. When filled to capacity with earth, it weighs approximately 80 tons. This vehicle will be referred to as the scraper.

The Cook Construction Company was engaged in the performance of the earth-moving contract at the Glen Elder Dam in the Missouri River Basin near Beloit, Kansas. Work on the project had started in December, 1964. By the time of the accident, May 17, 1965, excavation for the dam, referred to as the "core trench," had been carried 40 feet below the ground level. Excavation was to go still farther down to firm shale to form the bottom or foundation of the dam. The excavation was already well below the ground water table, and as a consequence, the core trench, through which the scraper was required to travel in carrying on the excavation work, was a slurry of mud and water. On the day of the accident the mud was so deep that the scraper, traveling through it, would sink down to its front bumper. This was approximately 4 feet deep. Although the scraper was powered by two motors, one for the tractor unit and one for the trailer unit, at times the scraper would have to be pulled through the trench for loading.

To alleviate the water problem the Cofferdam Unwatering Com-

pany, a subcontractor, undertook the job of "unwatering" the excavation. It did this by laying pipe in the excavation to permit the water to be pumped out. Three employees of the Cofferdam Unwatering Company were involved in the accident here in question.

Baskins, an employee of the Cook Construction Company, was operating the scraper at the time of the accident.

Two berm roads were constructed and used on the sloping edge of the project to remove earth taken from the excavation.

On the day of the accident a crane was located at the outer edge of the first berm roadway up from the bottom of the excavation. This crane was used by the Cofferdam Unwatering Company to lower pipe into the excavation.

At 1:45 p. m. on May 17, 1965, the three employees of the Cofferdam Unwatering Company were going south from the crane on the berm road toward a pipe trailer which was 65 feet south of the crane. They were going to the trailer to get more pipe and were walking in single file, Jerry Hancock leading the way, John Roy Benton behind him, and Guy Garst, the employee who died of his injuries, bringing up the rear.

Baskins, operating the scraper, was going in the same direction on the berm road. He had taken a load of earth out of the excavation and was returning for a fresh load.

The three employees had been working on the berm road where the accident occurred since 10 o'clock that morning. They knew the scraper was using the same roadway. In that period Baskins, before the accident, had made eight or ten trips on the same roadway.

The berm road was not of sufficient width to permit Baskins to pass the crane with the scraper without turning out partially up the the slope and going around. As he approached the crane he turned his scraper, as he had before, slightly to his right to pass the crane. As Baskins passed the crane he turned to look back "to check the clearance" and then "cut it back to the left to get back to the haul road." When Baskins next looked forward he, for the first time, saw the three workmen walking to the pipe trailer.

Baskins was moving 10 or 12 m. p. h. in third gear, of the four at his disposal. He immediately turned the steering wheel of the scraper to the right, applied the brakes, dropped the bowl or pan of the scraper to provide additional braking action, down-shifted from

third to second gear, and from second to first. (The order in which these actions were taken is not clear from the evidence.) Measurements showed the pan dragged from the point where it was dropped "a distance of six feet" to the point where the machine stopped.

In spite of these efforts the scraper did not stop in time to avoid running into and injuring the three workmen. (The verdict in the lower court was also against Baskins for his negligence, but his appeal has been dismissed.)

The brakes, inspected after the accident, proved to be filled with the mud of the core trench. Baskins said: "It had been several days since I made any effort to clean the brakes or brake drums." He knew the brakes "were open" and knew "water and mud and foreign materials would collect in the inside of the brakes."

Baskins thought that when he "turned the wheel to the—back to the right" that "the machine failed to turn."

Tests after the accident disclosed the steering on the scraper functioned both before and after the accident as it was designed to function. The government safety officer inspecting the accident said: "The angle at which the scraper was sitting indicated that the operator was in the process of making a right turn at the time that the machine came to a stop."

The scraper was 44 feet 3½ inches long, leaving, after it cleared the crane, less than 21 feet between it and the pipe trailer. Before the scraper had covered that distance it hit the workmen who were within 6 or 7 feet of the pipe trailer at the time they were struck. When Baskins first saw the three workmen he had less than 15 feet in which to bring the scraper to a stop.

It is conceded by the parties to this appeal that both the steering system and the braking system on the scraper functioned as they were designed to function at the time the accident occurred. No claim is made that any part of the scraper broke or was fabricated of materials of inadequate strength or functioned otherwise than in exact accordance with its design. The claim against General Motors is based solely on asserted negligence in design, in the following particulars:

(1) Designing the braking system on the Euclid TS-24 scraper so that it was not enclosed in such a manner to prevent mud or other foreign material from getting on the brake linings.

(2) Designing the Euclid TS-24 scraper in such a manner so that the hydraulic system fails to deliver adequate steering power at low engine speed.

The brakes on the scraper are air operated. Each of the four

wheels has a brake drum which is attached to, and rotates with, the wheel, and a set of four brake shoes which do not rotate with the wheel. The contact between the moving drums and the stationary shoes provides the braking action.

The brakes are of "open" construction, with drums and shoes exposed on the inner side of each wheel. Since the scraper was operating in slurry, mud of course could and did collect in the brakes. Once mud got into the brakes it would have to be washed out. However, the brakes had not been washed since May 12—five days before the accident. During that time the scraper had been working in the excavation day and night.

After the accident when the brakes were checked they were found to be full of mud. When the mud was removed the adjustment of the brakes was checked and they were found to need no adjusting.

Tests made of the brakes about one hour after the accident, when they were in the same condition as at the time of the accident, disclosed that the scraper traveling 10 m. p. h. could be stopped in 40 feet by applying the brakes—in less distance than the length of the scraper.

When the brakes were washed out and the same test was run over again, the scraper stopped in approximately 20 feet when traveling 15 m. p. h.

The steering system of the scraper is hydraulically operated. A pump directly geared to the engine circulates hydraulic fluid. When the steering wheel is turned, a valve opens and the fluid, directed against cylinders, pivots the tractor unit of the scraper about the king pin assembly connecting it to the trailer unit.

The tractor can be turned 90° in either direction—the full maximum 180° arc being referred to as "lock to lock" or "stop to stop" steering. The steering wheel can be turned 85° in either direction from a neutral point. If the steering wheel is turned a short distance, the steering valve is only partially opened and the flow of hydraulic fluid is limited accordingly. If the steering wheel is turned the full 85°, the steering valve is completely open and maximum steering speed is obtained. The tractor unit continues to turn as long as the steering valve is partially or fully open, until it hits the lock after a full 90° turn.

Since the hydraulic pump is geared to engine speed, it turns faster at high engine speeds and slower at low engine speeds.

The engine speed varies from a low, at idle, of 500 to 600 rpm, to a governed high of 2100 rpm. At minimum idle of 500 rpm, the tractor unit will turn, even when at a standstill, through the full 180° arc in 31 seconds (or, make a complete right or left turn of 90° in 15½ seconds); at maximum 2100 rpm it will make the full 180° turn in 6 seconds (or, make a complete right or left turn of 90° in 3 seconds). The steering is facilitated when the scraper is in operation by the fact that the scraper can be shifted into four forward gears and operated at engine speeds from idle to full throttle in each gear.

The pan or bowl of the scraper is lowered when the scraper is in the loading process, and it loads by digging into the earth as the scraper is propelled forward. Peter Cadou, one of General Motors' engineering experts on earth-moving equipment, testified the pan was commonly used as a brake on the scraper to bring it to a stop sooner—that "The scraper is equipped with a pan for use as a brake."

Leroy Stephen, night operator of the scraper for the Cook Construction Company, testified: "I got into the habit of carrying the pan or bowl of the scraper real low to the ground and using that instead of brakes. I just didn't pay much attention to the brakes."

The pan or bowl on the scraper is operated by a push lever from the operator's seat. It is necessary to use the right hand and hold the lever over to lower the bowl to keep it moving downward. As long as the lever is held over by the hand the hydraulic power will keep forcing the pan or bowl down.

Approximately two hundred pages of testimony are presented in the record on the issue as to whether the 40-ton scraper manufactured by General Motors was unreasonably dangerous for the purpose for which it was intended. The appellees contend General Motors consciously and intentionally designed the machine in such a way that in some circumstances it can neither be stopped quickly nor turned suddenly. The appellees argue:

". . . It was designed that way because General Motors did not think safety was a major concern on a construction site, because its machine performed as well as its competitors' machines did, because most of the time these deficiencies would not matter, and because designing it to operate in a safe manner is difficult. Such philosophy and excuses are culpable."

The appellant, on the other hand, contends the plaintiffs' case fails as a matter of law because their proof shows no defect in

design, but, at most, merely that something better might have been designed, and that the manufacturer owes no such duty.

If there is presented in the record any evidence of deficiency in design, it must be found in the testimony of John B. Sevart, the expert witness offered by the appellees. General Motors offered four expert witnesses, all of whom found both the brakes and the steering well and correctly designed for the purpose intended:

Ralph Super, for twenty years, until his retirement, was chief engineer of the brake division of Rockwell Standard, the world's largest manufacturer of heavy duty brakes. The brakes in question were a product of Rockwell Standard.

Peter Cadou, staff engineer with the General Motors earth-moving division, had six years' experience in testing steering and braking systems of scrapers.

Edward R. Fryer was engaged in the business for nearly a quarter century, the inventor of many patents relating to scrapers, and is now product manager of General Motors Euclid scrapers.

Harold Schindler is design engineer of hydraulic controls for General Motors Euclid scrapers, with nearly a quarter century of experience.

The appellees' expert witness, John B. Sevart, is an assistant professor of mechanical engineering at Wichita State University, at the time studying for his doctorate. His specialty is in systems and design. Basically, he is involved in the study of the inter-relationships of various components in regard to the ability to accomplish a specific task. In addition to graduate work in this area, he has also taught courses in systems, machine design and engines, power plants, transportation vehicles, mechanical control systems and dynamics of machinery. At the time of trial he had had some fifteen years of technical and engineering experience in numerous fields. This began with the study of electronics in the military. Thereafter, he tested airplane systems for Cessna Aircraft Corporation, performed numerous jobs for Boeing, including interpretation of drawings and test procedures, devised procedures for repair and salvage of parts, developed hydraulic systems for controls of the B-52 airplane, did research on flight control systems for aerial refueling and low level operation of the B-52 airplane, developed proposals and flight simulators for the Boeing version of the TFX, perfected autopilot systems, and general consultation work.

He has performed independent consultation work including the development and analysis of a new type of oil field pump, development of a hydraulically powered version of that pump, and development of arming devices for artillery shells.

During the months immediately prior to this trial he had been working on the development of a mine-sweeper system for Cardwell Company under contract with the United States Navy. His specific responsibility was as a supervisor of the systems group and the stress group. This involved designing two hydraulically operated cranes mounted on shipboard, together with four separate electronic control systems for each crane, a braking system and hydraulic gear box drive.

Sevart had a limited amount of experience on hydraulic systems. On cross-examination he testified he was not a member of the Society of Automotive Engineers (SAE), and was not familiar with its standards relating to earth-moving equipment. He was not familiar with the portion of that society known as the Construction and Industrial Machines Technical Committee, or any of the standards that the committee has promulgated relating to heavy equipment. But he did know it had such standards.

Sevart was first employed by appellees' attorneys in regard to these cases in March, 1968. On March 19, 1968, he first testified by deposition concerning his opinions, and at that time he had never examined a scraper or comparable heavy equipment. He testified again by deposition on July 31, 1968. By that time he had had an opportunity to spend approximately one hour on the assembly line at the General Motors Euclid plant. He testified:

"Q. Now, when you first testified in this case on March 19th, 1968, you stated very frankly that you didn't consider yourself to be a qualified design engineer in heavy construction equipment, isn't that correct?

"A. Yes, I made the statement.

"Q. And at that time you'd spent about 20 hours working on this case reviewing the facts and so forth?

"A. Mostly reviewing the maintenance manual and working with all the data that was available to us at that time."

On the 31st day of July, 1968, after spending "about 60 to 70 hours" in study of braking and steering, Sevart thought he was qualified in the design of systems—the steering system and the braking system.

Approximately two weeks prior to the trial he had an opportunity to examine Michigan and Hancock equipment in Lubbock,

Texas, and talked about three hours with the chief engineer and examined equipment. At the trial he further testified:

"I have never seen a scraper in actual operating conditions at close range. I have seen some movies of this equipment in operation. I don't pretend to be an expert on the operation of the equipment. I don't consider myself to be an expert on structural design. . . ."

At the trial General Motors objected to the qualifications of Sevart to testify as an expert on the design of the scraper here in question, but was overruled. On appeal we do not reach this question. (But see 3B Averbach, Handling Accident Cases, Products Liability, § 39, pp. 127-129 [Rev. Ed. 1971]; K. S. A. 60-456; *Trimble, Administrator v. Coleman Co., Inc.*, 200 Kan. 350, 354-357, 437 P. 2d 219; *Swanson v. Chatterton* [1968] 281 Minn. 129, 160 N. W. 2d 662, 31 A. L. R. 3d 1152; and *Wojciuk v. United States Rubber Co.* [1963] 19 Wis. 2d 224, 120 N. W. 2d 47.) The foregoing, however, does have a bearing on Sevart's testimony regarding the design defects of the TS-24 scraper.

Sevart considered the braking system of the scraper here in question reasonably designed and entirely adequate for use under dry conditions. Under those circumstances, he considered it a very standard design and had no complaints about the strength of the drums or the shoes. His challenge to the braking system related only to the open-type construction that allows mud to freely get in the system.

He knew of no other manufacturer, mentioning seven, that had other than "open" brakes on its similar equipment. He recognized there were some considerations which favored open brakes.

Sevart's theory was that "there should be a shield or a guard on the braking system as standard equipment." He proposed a flexible seal over the brake. The substance of his testimony was that such structure would not keep water out, nor would it keep mud or other foreign materials out. It would merely reduce the build-up time so that maintenance would not be required every day or every half a day, but probably on a weekly or biweekly basis. The build-up "would be over a longer period of time." He did, however, recognize that there would be a build-up of mud and foreign matter in the brakes over a given period of time.

Sevart knew of no flexible material that could be used to provide the seal over the brake which his theory postulated.

When cross-examined concerning several materials available which he mentioned could be used, it was disclosed that these

materials would break down at temperatures of 250° Fahrenheit, and therefore, could not withstand either the brake temperatures of 500 to 800° Fahrenheit developed almost constantly when the scraper was in use, or the cherry-red temperatures of 1300° Fahrenheit to which the brakes heat under severe operating conditions in mountainous terrain. The flexible materials he mentioned would be subject to abrasion.

The substance of Sevart's testimony relative to sealing the braking units was that he could not specify a definite material that should have been used in the flexible seal at the time the TS-24 was designed between 1955 and 1962. He explained he was not a "materials expert."

The record discloses that no manufacturer had solved the problem. General Motors supplied an optional brake guard purchased by 25 to 30% of the customers. This guard, however, would serve only to keep out stones and like large pieces which could jam or destroy the brakes altogether, as, for example, in work in rock quarries. Nothing, however—not even Sevart's seal—it was agreed, would keep out mud and water.

General Motors in the 1950's, starting well before the scraper here in question was designed in 1955-1956, and first produced in 1957, had tried to fabricate a sealed brake system for scrapers. However, such system proved to be unreliable. In addition, North American Rockwell had worked on a sealed brake system for use in equipment operating in rice fields. Their expert testified: "We put on such a seal and our experience was that it was quite unsatisfactory."

General Motors' expert, Ralph Super, testified that in putting a shield on brakes the closer or more precisely the fit is made or the more you try to seal the brake, the more you create a heat problem; that a brake in its very essence is a unit that converts the energy of motion into heat and then dissipates the heat; that heat is part of the concept of braking. He said:

". . . If you have brakes going down a grade and at the bottom you go into water or slurry, which is high enough to get in your brake, then the minute that this brake hits the water or slurry which has a cooling effect a vacuum is created inside the brake cavity and this tends to suck in the water and slurry. This is what brings it in in spite of the closeness of the fit of the shield. That is the reason that sealing has become a very difficult problem."

On cross-examination Super, who retired January 31, 1968, from the Rockwell Standard Brake Division of the North American

Rockwell Company, testified that his company had not developed sealed brakes for commercial vehicles. He distinguished commercial vehicles from military vehicles, particularly the amphibious type which are designed to operate as a truck on land, where a sophisticated sealed braking system was installed. These were tactical vehicles and were much smaller than the earth-moving equipment here under consideration. The technology in the development of braking systems, according to Super, has not developed to the point where such braking system can be used in the design of a scraper such as the TS-24. Super said:

". . . In our company, we have not gone beyond the military because of the necessity for proper development and experience on it before it can be introduced into the commercial field.

"General Motors is one of our largest customers. They have never offered to finance any research project in this area."

Sevart also testified regarding the steering system of the TS-24 scraper. He made no claim, nor did anyone else, that any part broke, was fabricated of any defective materials, or operated otherwise than as designed. To the contrary, he said: "My theory is that the steering system is reasonably well designed." His only complaint was that "it steers too slow at low engine rpm. The way the machine is now designed, the speed of the steering depends upon engine speed." Sevart thought he could improve the steering system on the TS-24 scraper. He made three proposals which he claimed would have improved the steering. He had never constructed the steering systems he envisioned in his theory. He said: "I have not had the opportunity to put together a working model of the systems that I have talked about and try them out," and confessed that in testing a given system, "you frequently find that your first thoughts are not actually correct on the design and you have to back up and rethink the proposition and kind of start out again."

The changes in steering that Sevart thought would make the turn more rapid were, first, to double the pump size and add a bypass. He said:

". . . One way would have been to install a larger motor or larger pump. This would have had the effect of providing more flow of hydraulic fluid at lower engine speed. In connection with the larger pump, I would install an additional by-pass valve. This valve would route hydraulic fluid back to the reservoir. The effect of this arrangement would be to provide more flow of hydraulic fluid to the turning cylinders at low engine speeds."

Sevart thought this system was in use on the Michigan scraper, but it turned out he had misunderstood and, on rebuttal, admitted: "I do not know of an example of this double size pump and the bypass valve on a scraper or heavy construction equipment."

Edward R. Fryer, General Motors' product manager for Euclid scrapers, pointed out, of the 432 horsepower developed by the front engine, 82 horsepower are already utilized in operating the pump employed in the steering system. He said it would be detrimental to the operation of the scraper to waste an additional 82 horsepower that would be used in circulating this fluid from the tank back to the tank, instead of using that power in doing the work of excavating which the scraper is designed to do. Apart from such diversion of power, Fryer pointed to added problems that would be created:

"The horsepower that is being wasted with a double size pump becomes heat which has to be cooled. So there is an additional problem in that you have to dissipate heat that is generated as a result of this bypass. That would be by either an oil cooler or something that would allow the air or radiation to take the heat away from the system. Our present system generates a small amount of heat as it passes the hydraulic fluid. I do not know the limit of heat that can be tolerated within the hydraulic system in terms of horsepower but I know that we can get into a situation where we start getting quite warm in this tank. We are about as close as we feel we want to be to the limit that can be tolerated in this connection. . . ."

In view of the work to be done by the scraper, Fryer did not approve utilizing up to 38% of the front engine for steering.

Sevart did not think the heat problem would be so serious but he did agree "the heat might go up, oh, 40, 50 percent." To solve the heat problem Sevart said he would increase "the size of the reservoir." Sevart agreed the "power bleed" was a problem, but he considered it would not prove "an insurmountable problem."

These problems, according to Sevart, would be avoided by his second alternative—a two-speed drive. He said this system would leave the pump the same size and add a variable-speed drive. He said:

". . . The simplest way would be to have only two speeds. This would allow the pump to rotate faster than engine speed at the low rpm and to rotate at or less than engine speed at the upper rpm level. . . ."

Sevart admitted: "I don't know of any application of this type of arrangement on a scraper or any comparable heavy equipment."

To avoid the criticized *sudden shift* at some point from one gear to the other, thereby creating a safety hazard in steering, Sevart

proposed a third alternative—that of a variable-speed cone drive. This alternative proposed by Sevart to improve the steering "would have been to put some form of continuous gear ratio between the pump and the engine. . . . One such example is the cone drive. The cone drive would provide a continuously variable gear ratio."

Although Sevart said, "Several of these are on the market now and have been available for numerous years before 1950," General Motors' Fryer pointed out that no application of the cone drive uses "as much horsepower as in the steering system of the TS-24." He said, "I know of no heavy equipment manufacturer who uses anything such as the cone gear in the steering system." General Motors' Schindler, similarly, knew of no application of the cone drive "in situations where as much as 82 horsepower is involved." He added: "No such drive devices were available during the period 1955 to 1962 and to the best of my knowledge are not available now." Sevart, with respect to the cone drive method admitted: "I don't know of any application of this type of arrangement on a scraper or any comparable heavy equipment."

The theoretical nature of Sevart's suggestion is revealed by his further statement: "To my knowledge, nobody has ever tried to use this arrangement on a scraper." Sevart added:

"The application of this type [cone drive] device that I'm familiar with involves approximately 15 horsepower. I do not know of any application of the continuous gear ratio arrangement where there is 80 or more horsepower involved. If the two gears somehow became disengaged, you would lose your steering power. I think it might be reasonable to test an arrangement like this before moving it up from a 15 horsepower environment to an 80 horsepower system."

With respect to the steering system utilized by the General Motors scraper, the record discloses no better solution was known to the industry. The steering system utilized by General Motors on the scraper in question is the standard type equipment in the heavy construction field. It is used by all manufacturers of like equipment except only Westinghouse-LeTourneau which in some models had electric steering. The evidence discloses the electric steering was slower than the hydraulic steering even at low engine rpm. Sevart admitted the steering system is, except for his complaint that it is not as fast as he would have made it, "reasonably well designed."

General Motors' Fryer described the search for a better system, which so far has eluded the industry. He said:

". . . Our company has done research on this. We have investigated variable speed pumps. I believe that the variable speed pump offers a possible solution for better steering at low rpm. In this regard, we have gone to the extent of both design and hardware prototype and have conducted proving ground testing. However, the reliability of the system has not been satisfactory. We don't know all the things required to make it reliable or we would have the system now. The state of the art as it existed at the time the TS-24 scraper was being manufactured, that is, 1964 and before, would not permit the incorporation of any such type of steering system."

In 1957 Mr. Cadou, a General Motors expert witness, as test engineer, performed a comprehensive series of tests on the steering system of the S-18 scraper, which was the immediate predecessor of the TS-24 scraper. Although the TS-24 was larger and had materially increased load capacity to the S-18, the steering and braking systems of the S-18 were adapted to the TS-24 and were essentially the same. In 1964 when the TS-24 scraper involved in this accident was produced, the steering was sufficiently similar to be indicative of the response in the previous model of the S-18. Following his work in 1957 Mr. Cadou directed a written report to Mr. Schindler, then in charge of hydraulic systems, concerning his advice relative to the steering. Mr. Cadou testified:

"Q. Then, you continue in your report to say: 'The two most generally repeated comments concerning the S-18 steering are that—1. The steering effort or torque is not great enough in some situations, and—2. The steering system response is erratic.'

"A. Yes, sir.

"Q. And you told him that back in 1957, is that right?

"A. That is correct.

"Q. Didn't you go on to tell him: 'Much of the criticism, insofar as turning torque is concerned, comes as a result of low pump pressure due to either low engine speed or worn out, inefficient pumps.'?

"A. Yes, sir.

"Q. That was perfectly obvious to you back in 1957, wasn't it?

"A. Yes, it was.

"Q. And you told your superior that, didn't you?

"A. That is right.

"Q. And the purpose of this report was to enable him to design a better hydraulic system, wasn't it?

"A. In part.

"Q. Make it a safer system?

"A. In part.

"Q. And you gave him this report, and it came from his files?

"A. Yes, sir.

"Q. Now, you even made formal conclusions, did you not?

"A. Yes, I did.

"Q. Now, in a loud voice, would you read to the jury what those were?

"A. 'Conclusions: The S-18 compares favorably with comparable machines tested insofar as turning torque and turning time are concerned; however, it is felt that some consideration could be given the refinement and improvement of the steering control system to provide better response characteristics.' "

The appellees place considerable reliance upon the foregoing testimony of Mr. Cadou to support their proposition that the 40-ton scraper here in question manufactured by General Motors was unreasonably dangerous for the purpose for which it was intended.

The record discloses that with the type of earth-moving equipment here under consideration, design is a continuing thing. Fryer, employed as a mechanical engineer by General Motors, testified as an expert as follows:

"The availability of hardware and material is a very big factor in the engineering and design effort that goes into the initial design of something like a scraper. This is particularly true in our industry where we are at the outer limits of size, the availability of higher horsepower, the transmissions with which to change the speed and torque output of this horsepower, the axles, the rubber tires themselves. Everyone of those things takes a major development effort and requires that you have some allied industry people working along with you at the same time in order to come up with these large capacity products.

"The initial TS-24 was produced in 1957. In the TS-24, we had one of the more major improvements of the scraper product in terms of horsepower, reliance, durability and so forth. There was a major change in the TS-24 that was introduced around 1962. We had a substantial increase in the horsepower and the related power train that it took to handle this higher horsepower. Design is a continuing thing.

"Other scrapers manufactured by our company had a bearing on the initial design of the TS-24. The first overall tractor scrapers that we produced were the S-18 and TS-18. The braking and steering systems of the S-18 and TS-18 were similar to those which we employed on the TS-24. The design of the then TS-24 brakes and steering evolved from the S-18 and TS-18. It is my opinion that the brakes on the Euclid TS-24 are reasonably designed for the intended use and that they are reliable.

"Q. What is the importance of reliability in equipment such as the TS-24?

"A. The importance of reliability is predictability, safety. You need reliability to have the safe feeling. You do not have confidence if your brakes don't work; you are going to feel very unsafe in anything you do.

"Q. All right, sir. Now did you hear Mr. Cadou this morning when he described a different approach being taken by General Motors people and an attempt to develop a seal disc type brake which would keep all these detriments out of brakes?

"A. Yes. I did.

"Q. Did you have an opinion as to whether that's a reasonable approach to the matter of improving the brakes?

"A. I think it's a very interesting, desirable approach.

"Q. Do you think it's reached the point where it's a reliable system?

"A. It is not with us.

"I heard the suggestion made by Mr. Sevart for improving this brake system. I heard his reference to the flexible seal to be placed on the brake guard. In my opinion that would not be a reliable way of improving the brakes. I have not heard of a seal device which would withstand the environment that these scrapers are expected to withstand.

"Some of the primary design considerations at the time the steering system of the TS-24 was designed were performance, reliability, durability and safety. The type of job is extremely variable from slow, hard pulling to the other extreme of approximately 30 miles per hour operations for hauling. The primary function of the TS-24 is to haul earth. In performance of that function, it is necessary to have the extreme steering capability to maneuver the tractor. This is when you are working the engine hard with the engine rpm high. When you are working out or scraping out earth and picking it up and later unloading it, the engine is generally running 1800 to 2100 rpms. On the haul roads, the scraper will generally be up to 1800 to 2100 rpms. If you have performance, reliability and durability, you automatically have safety. These were some of the considerations that we had in mind when we undertook design of the steering system of the TS-24. We selected the system which has been shown to the court where hydraulic cylinders react to get relative motion between the tractor and scraper units."

He further testified:

"Our company has manufactured between 3600 and 3700 TS-24, S-18 and TS-18 scrapers using the braking system identical to that we have been talking about."

The attempt of General Motors to show by evidence that no claim or complaint of accident or injury had been blamed on the steering system or defective design of the steering system of the scraper in question was met by objection, which the trial court sustained. This point we do not reach in our decision. (See 71 Yale L. J. 816, at pp. 830-833, "Manufacturer's Negligence of Design or Directions for Use of a Product.")

The case at bar does not involve an "implied warranty of design," but it does involve negligence in design. On this point the manufacturer has a duty to use reasonable care in the design of its product so it will be reasonably safe for its intended use, including any emergencies of use which can be reasonably anticipated. (See Instruction No. 8, *supra*.) Whether the record presents sufficient evidence of a breach of that duty by the manufacturer to require submission of the question to the jury is conceded by the parties to be a matter of law.

The appellees contend that even though the product was operating

exactly as it was designed to operate it was still defective, if it created an unreasonable risk of injury. They argue General Motors not only violated but simply ignored the principle, having assumed that if operators did not complain, performance is adequate; that General Motors only designed its machine to perform as well as its competitors; and having decided that most normal operating conditions did not require rapid turning of engines, General Motors simply ignored that problem. They further argue that General Motors, having assumed that safety is not a significant factor on a construction site, paid no special attention to it; and since emergencies on construction sites are not important, the ability to respond to them was not considered.

The courts are nearly unanimous in saying the product-design duty of a manufacturer *is that of reasonable care,* but it is not an insurer that its product, from a design standpoint, be accident-proof or incapable of producing injury. (*Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 648, 433 P. 2d 380.)

In the instant case it is not enough to say that the scraper did not stop or turn quickly enough. In 42 Wash. L. Rev. 601, "Manufacturer's Liability for Defective Automobile Design," it was said:

"To prove defective design, it is insufficient merely to assert that a different design would have alleviated or averted the plaintiff's injuries, since it may be assumed that any particular accident involving man and machine might have been avoided through a variation in the design of the machine. However, such a variation might greatly magnify the chances of other sorts of mishaps taking place, or else render the machine incapable of reasonably efficient performance of its function. . . ." (p. 608.)

The need to show that there was a defect of some kind in design and not merely that a better design might have been conceived, is illustrated in *Winn v. Sampson Construction Co.,* 194 Kan. 136, 398 P. 2d 272. There the court held the contractor liable "for alleged negligence in designing and constructing a grain storage elevator which resulted in a partial collapse of the structure." (p. 137.) But this was affirmed only upon a meticulous analysis of the evidence demonstrating the deficiencies in design that brought about the collapse.

All courts agree that as a matter of law, a manufacturer is not obligated to adopt only those features which represent the ultimate in safety or design. (*Stevens v. Durbin-Durco, Inc.* [Mo. 1964] 377 S. W. 2d 343, 348; *Bartkewich v. Billinger et al., Aplnts.* [1968] 432 Pa. 351, 247 A. 2d 603; *Kerber v. American Machine & Foundry*

*Company* [8th Cir. 1969] 411 F. 2d 419; and *Mitchell v. Machinery Center, Inc.* [10th Cir. 1961] 297 F. 2d 883.)

In *Dean v. General Motors Corporation* (E. D. La. 1969) 301 F. Supp. 187, the court said:

"Negligence is not proved merely because someone later demonstrates that there would have been a better way. Reasonable care does not require prescience nor is it measured with the benefit of hindsight. Tort law does not expect Saturday manufacturers to have the insight available to Monday morning quarterbacks." (p. 192.)

In the determination of whether or not a manufacturer has in fact exercised the care and skill of an expert, several matters are to be considered. One of the most significant factors is whether others in the field are using the same design, or a safer design. Other factors to be considered are whether a safer design not yet in use is known to be feasible, and whether in the case of a new product there has been adequate testing. (*Watts v. Bacon & Van Buskirk* [1959] 18 Ill. 2d 226, 163 N. E. 2d 425; and *Amason v. Ford Motor Co.* [5th Cir. 1935] 80 F. 2d 265.)

While cases indicate that use by others of the same design tends to negative an allegation of negligence, this evidence is not always conclusive, as stated by Justice Holmes in *Texas & Pacific Ry. Co. v. Behymer* (1903) 189 U. S. 468, 47 L. Ed. 905, 23 S. Ct. 622: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." (p. 470.)

This principle has been applied in the field of products-design in *Northwest Airlines v. Glenn L. Martin Company* (6th Cir. 1955) 224 F. 2d 120, where the court said:

". . . the fact that Northwest conformed to the practice of other airlines in failing to equip No. 44 with radar did not establish its exercise of ordinary care as a matter of law. Customary practice is not ordinary care; it is but evidence of ordinary care. . . ." (p. 129.)

The alternatives suggested by the appellees' expert witness were neither available nor feasible. In *Stevens v. Allis-Chalmers Mfg. Co.*, 151 Kan. 638, 100 P. 2d 723, the court said:

". . . at the time of the sale, or at the time of the accident, no device had been contrived or invented to serve as a shield around the middle universal joint so as to protect persons working about the outfit from coming in contact with it." (pp. 642, 643.)

In reversing the lower court with instructions to enter judgment for the defendant the court observed:

". . . Not many years ago, the automobile was started by a hand crank which often evinced a temperamental habit of 'kicking' which resulted in a broken wrist of the operator. In time a safe device for starting automobiles was invented, but it could hardly be said that the early auto-manufacturer was culpably negligent in equipping his vehicles with hand cranks. . . ." (p. 644.)

The appellees attack the position of General Motors to retain a competitive position in the manufacture of earth-moving equipment and their interest in economy. In our free enterprise system the ability of a manufacturer to remain competitive is a prerequisite to any manufacturer at all, and rules of law cannot be fashioned without giving due consideration to the economic factors involved. For example, General Motors in the manufacture of earth-moving equipment is not required to expend exorbitant sums of money in research to devise a sophisticated braking system which would price its product completely out of the market. The TS-24 scraper here in question is shown to have cost approximately $90,000.

The mammoth TS-24 scraper here under consideration was designed primarily to haul earth. It had the capacity to haul 40 tons of earth in one load. The type of job it was required to do was extremely variable, from slow, hard pulling in the loading process to the extreme of maneuvering at approximately 30 m. p. h. in hauling. In the performance of such work the scraper was designed for use in variable environmental conditions, from level to mountainous terrain, in rock and soil, and from dry to wet and muddy conditions in excavations where deep slurry is encountered. In the performance of its function the scraper was designed to have extreme steering capability to maneuver.

When the purpose for which the TS-24 scraper was intended and the environment in which it was to be used are considered, we cannot say the evidence upon which the appellees rely discloses the scraper to be unreasonably dangerous. The air brakes were sufficient, even with the accumulation of mud in them, to stop the scraper in a shorter distance than its length at a speed of 10 m. p. h., the speed at which it was traveling when the accident occurred. It could be stopped in a much shorter distance by using the pan or bowl as a brake. No sealing device for enclosing the brakes to keep out mud was shown by the evidence which would withstand the environment to which these scrapers are subjected.

The performance of the steering system was reliable and durable. It was the standard steering system used in the heavy construction

industry and no better turning device available was disclosed by the evidence.

An attempt has been made in this opinion to fairly analyze the evidence in a highly technical record to give perspective to our decision.

In our opinion the evidence upon which the appellees rely to prove negligence in the design of the braking and steering systems of the TS-24 scraper was not of sufficient dignity to warrant its submission to the jury for consideration. In other words, there was no substantial competent evidence, as a matter of law, upon which the jury could find the appellant negligent in designing the braking and steering systems of the TS-24 scraper. Accordingly, the trial court should have sustained the appellant's attack upon the evidence made at various points throughout the proceedings.

The judgment of the lower court is reversed.

FATZER, J., dissenting: Limitations on time preclude full expression of my views in this case. A single claim was advanced at trial and is involved in this appeal. It was claimed that General Motors was negligent in the design of the TS-24 scraper because the machine was not reasonably safe for the purposes for which it was intended.

What was claimed and what was proved by the plaintiffs' expert testimony was that the scraper was defective in the sense its design created an unreasonable risk of injury to operators and others working in its vicinity, and that under some environmental circumstances it could neither be turned nor stopped quickly. The plaintiffs' claim the steering system was defectively designed was amply supported by General Motors' own witness, Mr. Cadou, who testified he related in his written report in 1957, to Mr. Schindler, then in charge of hydraulic systems for General Motors, that "[t]he steering effort or torque is not great enough in some situations"; that "[t]he steering system is erratic," and that "[m]uch of the criticism, insofar as turning torque is concerned, comes as a result of low pump pressure due to . . . low engine speed . . ." Cadou's report concluded that, "some consideration could be given the refinement and improvement of the steering control system to provide better response characteristics."

The recommendation was ignored and the steering response was not corrected, but remained essentially the same in the present

scraper. Moreover, and with respect to the braking system, the plaintiffs' evidence was that an adequate braking system is designed for military vehicles, but General Motors' evidence was that such a system could not be so designed for commercial scrapers. It is obvious the jury did not accept General Motors' evidence.

It is a rule of long standing that this court will not overturn findings of fact where the evidence is such that reasonable minds might differ. Likewise, with respect to the sufficiency of evidence, this court may not weigh the evidence or pass upon the credibility of any witness, but is required to consider all of the plaintiff's evidence as true, giving it the most favorable inference, disregarding that which is unfavorable, and may not weigh any difference between the direct and cross-examination. The court's holding today violates these fundamental principles in that it unduly relies on testimony which was contradictory to, or inconsistent with, the testimony favorable to the plaintiffs, and which was rejected by the trier of the facts.

The district court permitted the plaintiffs' witness Professor Sevart, to qualify and testify as an expert witness. His testimony was based upon facts which afforded a reasonable, accurate basis for the conclusions reached, and, thereafter, his credibility was strictly jury work.

In *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 431 P. 2d 518, the court considered the circumstances under which the opinion of an expert witness should go to the jury, and it was said:

". . . The test of competency of an expert witness is whether he discloses sufficient knowledge of his subject to entitle his opinion to go to the jury. (K. S. A. 60-419, 60-456.) Where an expert witness had disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of degree of his knowledge goes more to the weight of the evidence than to admissibility . . ." (l. c. 548, 549.)

In *Grohusky v. Atlas Assurance Co.*, 195 Kan. 626, 408 P. 2d 697, this court considered the function of a district court regarding an expert witness, and said:

". . . Fundamentally, the expert must be qualified to impart to the jury knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury from other sources. The district court has the primary function to determine whether or not a witness is an expert. (2 Wigmore, 3rd Ed., Evidence, Sec. 561, [1940].) . . ." (l. c. 630.)

*Grohusky* was followed and approved in *McElhaney v. Rouse*, 197 Kan. 136, 144, 415 P. 2d 241. See, also, *Temple v. Continental*

*Oil Co.,* 182 Kan. 213, 320 P. 2d 1039, where this court stated the rule with respect to the admission of expert testimony and the weight and conclusiveness to be given thereto. It was held that the admission of expert testimony was for the court, and its weight was for the trier of the facts. See K. S. A. 60-456, and the case annotations.

Time does not permit a detailing of Professor Sevart's testimony. In my judgment, it was sufficient to show the scraper was defective in the sense the design of the braking system and the steering system created an unreasonable risk, making the machine unsafe for the purpose for which it was intended, including any emergency use which could be reasonably anticipated. The jury accepted the plaintiffs' evidence as true, and this court may not weigh conflicting evidence. Findings of a jury determined on conflicting evidence are conclusive. See *Winn v. Sampson Construction Co.,* 194 Kan. 136, 398 P. 2d 272.

I would affirm the judgment.

FONTRON, J., joins in the foregoing dissent.